174 P.3d 25 (2007)
Cecile B. WOODS, Petitioner,
v.
KITTITAS COUNTY, a political subdivision of the state of Washington, Evergreen Meadows, LLC, and Stuart Ridge, LLC, Steele Vista, LLC, and Cle Elum's Sapphire Skies, LLC, Respondents.
No. 78331-4.
Supreme Court of Washington, En Banc.
December 20, 2007.
*28 FAIRHURST, J.
¶ 1 Petitioner, Cecile B. Woods, seeks review of a Court of Appeals ruling that the superior court lacks subject matter jurisdiction under the Land Use Petition Act (LUPA), chapter 36.70C RCW, to review a claim that a site-specific rezone application does not comply with the Growth Management Act (GMA), chapter 36.70A RCW. Woods claims the appellate court decision conflicts with our decision in Wenatchee Sportsmen Ass'n v. Chelan County, 141 Wash.2d 169, 4 P.3d 123 (2000). She also argues the Court of Appeals improperly decided other LUPA issues she raised at the superior court because she did not raise them on appeal and the superior court did not decide them.
¶ 2 Respondents, Evergreen Meadows, LLC, Stuart Ridge, LLC, Steele Vista, LLC, and Cle Elum's Sapphire Skies, LLC (hereinafter collectively referred to as CESS), and Kittitas County argue that the Court of Appeals correctly held that the superior court lacks subject matter jurisdiction to decide whether a site-specific rezone complies with the GMA. CESS further argues that the Court of Appeals properly addressed and decided Woods' remaining LUPA issues and they do not warrant further review by this court.
¶ 3 We affirm the Court of Appeals and hold that the superior court lacks subject matter jurisdiction under LUPA to decide whether a site-specific land use decision complies with the GMA. The superior court may decide only whether a site-specific land use decision complies with a comprehensive plan and/or development regulation. Because we stand in the superior court's position on review of an administrative decision, Woods' remaining LUPA issues are properly before us. We conclude that the Kittitas County Board of County Commissioners' (BOCC) decision to approve CESS's site-specific rezone application was supported by substantial evidence and was not an erroneous interpretation of the law or a clearly erroneous application of the law to the facts.

I. STATEMENT OF THE CASE
¶ 4 CESS owns 251.63 acres of land in Kittitas County. CESS's property was originally zoned forest and range (F & R). The F & R zone, which was adopted in 1974, creates areas in which natural resource management is the highest priority and where uses incompatible with resource management are discouraged. Kittitas County Code (KCC) 17.56.010. Land zoned F & R generally permits minimum lot sizes of 20 acres. Former KCC 17.56.040(A) (1992).[1] Former KCC 17.56.020 (1996) lists permitted uses in the F & R zone including single-family homes, lodges, agriculture, livestock, forestry, mining, quarry mining, and home occupations that do not produce noise. Former KCC 17.56.030 (2001) lists conditional uses in the F & R zone including airports, sawmills, firing ranges, temporary asphalt plants, feed-lots, public sanitary landfills, utility substations, and farm labor shelters.
¶ 5 In January 2004, CESS applied to the county for a site-specific rezone from F & R to Rural-3 (R-3). The purpose and intent of the R-3 zone, which was adopted in 1992, is to "provide areas where residential development may occur on a low density basis." KCC 17.30.010. A primary goal in siting R-3 zones "will be to minimize adverse effects on adjacent natural resource lands." Id. Land zoned R-3 generally permits minimum lot sizes of three acres served by individual wells and septic tanks. Former KCC 17.30.040(A) (1992). Former KCC 17.30.020 (1996) lists permitted uses in the R-3 zone including single-family homes, lodges, agriculture, forestry, home occupations that do not produce noise, and mining. Like the F & R zone, the R-3 zone includes a variety of conditional *29 uses, but the conditional uses allowed in the R-3 zone are generally less intensive than those allowed in the F & R zone. Former KCC 17.30.030 (1992) lists the conditional uses allowed in the R-3 zone including campgrounds, guest ranches, group homes, golf courses, mining, gas and oil exploration, home occupations that produce noise, and miniwarehouses.
¶ 6 Both the F & R and R-3 zones permit minimum lot sizes of one-half acre for lots within platted cluster subdivisions served by public water and sewer systems. Former KCC 17.56.040(B); former KCC 17.30.040(B). "[C]luster" subdivisions are "three or more buildable lots in which all lots are contiguous." Former KCC 17.65.020(A) (1996), repealed by Ord.2005-35 (2005). The permitted uses in a cluster subdivision "shall be those of the underlying zone and limited to single-family detached residential uses." Former KCC 17.65.030 (1996), repealed by Ord.2005-35 (2005). The maximum allowable percentage of cluster acreage is 30 percent for F & R zones and 40 percent for R-3 zones. Former KCC 17.65.040 (1996), repealed by Ord.2005-35 (2005).
¶ 7 The Kittitas County Planning Commission (KCPC) held a public meeting to discuss the site-specific rezone on April 26, 2004. The day of the public meeting, Mike Alberg, chairperson of the KCPC, received a letter from 1000 Friends of Washington (1000 Friends), which was distributed to commission members, urging denial of the rezone because it claimed the GMA requires a minimum density of five acres in rural areas and the R-3 zone allows a density of only three acres. The letter cited rulings of the Court of Appeals and the three Growth Management Hearings Boards (GMHBs) as the basis for 1000 Friends' claim that the GMA requires a five acre minimum density in rural areas.
¶ 8 After deliberation, KCPC approved the application by a vote of five-to-one. The BOCC approved the site-specific rezone by Ordinance 2004-15 on June 1, 2004.
¶ 9 In June 2004, Woods filed a LUPA petition, RCW 36.70C.070, in superior court, challenging the BOCC decision. Her petition claimed the decision (1) erroneously interpreted the law because it used incomplete findings and site-specific rezone standards and failed to include determinations regarding changed circumstances and consistency with the GMA, (2) was not supported by substantial evidence in the record, and (3) was a clearly erroneous application of the law to the facts because the environmental review was incomplete[2] and failed to disclose contemporaneous rezones in upper Kittitas County.[3] Woods argued that Wenatchee Sportsmen gave the superior court subject matter jurisdiction to decide whether a site-specific rezone complies with the GMA. Clerk's Papers (CP) at 92, 98.
¶ 10 The superior court granted Woods' petition and reversed the rezone. CP at 13-14. In its letter ruling, the trial court determined it had subject matter jurisdiction over the site-specific rezone. The court recognized, "[a]lthough the GMHB has jurisdiction to determine whether Kittitas County's RR-3 [sic] zoning ordinance violates the GMA, it does not have jurisdiction to review whether the BOCC's decision to rezone the subject property as RR-3 [sic] violates the GMA as applied by allowing urban growth (RR-3) [sic] in a rural area." CP at 11 (emphasis added). The trial court found:
Whether this RR-3 [sic] rezone is lawful depends on where the subject property is located within the county. In other words, the RR-3 [sic] ordinance may be consistent with the GMA when applied to some properties and inconsistent when applied to others. Since the property in this case is located outside of a designated UGA [urban growth area], a rezone that allows for development which is urban in nature violates the GMA. The fact that the property may never be fully built out is irrelevant to whether the application of RR-3 [sic] to this property has the potential to turn a *30 rural area into an area of urban growth density.
Id. The trial court did not explain the reasoning for its conclusion that the R-3 zone is urban in nature. Lastly, because of the trial court's decision that "BOCC erred by granting a rezone which allows for urban growth density in a rural area," it was unnecessary to reach Woods' remaining LUPA issues. Id. at 12. CESS and the county appealed the superior court's decision to Division Three of the Court of Appeals. Woods v. Kittitas County, 130 Wash.App. 573, 123 P.3d 883 (2005).
¶ 11 The Court of Appeals held that the superior court had subject matter jurisdiction to decide whether the rezone decision was consistent with the county's comprehensive plan but not whether the rezone complied with the GMA. Id. at 576-77, ¶ 2, 123 P.3d 883. It concluded Wenatchee Sportsmen held only that a party may challenge a site-specific rezone in superior court under LUPA based on incompatibility with the comprehensive plan, not noncompliance with the GMA. Id. at 583, ¶ 17, 123 P.3d 883. The appellate court declined to consider the rezone's compliance with the GMA and reviewed only the properly remaining LUPA issues. Id. at ¶ 18, 123 P.3d 883. It concluded that BOCC's decision was supported by sufficient evidence and BOCC did not clearly misapply the law when it determined that the site-specific rezone complied with the county's comprehensive plan. Id. at 588-89, ¶ 28, 123 P.3d 883.
¶ 12 Woods petitioned this court for review of the Court of Appeals reversal of the superior court decision, which we granted. Woods v. Kittitas County, 158 Wash.2d 1001, 143 P.3d 829 (2006).

II. ISSUES
A. Does the superior court have subject matter jurisdiction under LUPA to decide whether site-specific land use decisions comply with the GMA?
B. Should this court reach Woods' remaining LUPA issues and, if so, did BOCC properly approve CESS's rezone application?

III. ANALYSIS
¶ 13 We review questions of statutory interpretation de novo. Berrocal v. Fernandez, 155 Wash.2d 585, 590, ¶ 5, 121 P.3d 82 (2005). A reviewing court's primary goal is to determine and give effect to the legislature's intent and purpose in creating the statute. Am. Cont'l Ins. Co. v. Steen, 151 Wash.2d 512, 518, 91 P.3d 864 (2004); Dep't of Ecology v. Campbell & Gwinn LLC, 146 Wash.2d 1, 10-11, 43 P.3d 4 (2002). "[I]f the statute's meaning is plain on its face, then the court must give effect to that plain meaning as an expression of legislative intent." Campbell, 146 Wash.2d at 9-10, 43 P.3d 4 (citing State v. J.M., 144 Wash.2d 472, 480, 28 P.3d 720 (2001)).
A. The superior court lacks subject matter jurisdiction to decide whether a site-specific rezone complies with the GMA
¶ 14 Woods claims that in Wenatchee Sportsmen this court expressly recognized that the GMA and LUPA created two separate avenues for a petitioner to seek review of whether a land use decision complies with the GMA, and we held that the superior court has jurisdiction to determine whether site-specific land use decisions comply with the GMA. CESS disputes Woods' interpretation of our holding in Wenatchee Sportsmen. It argues the superior court lacks subject matter jurisdiction to decide any questions regarding compliance with the GMA, even where a party challenges a site-specific land use decision in a LUPA petition. CESS also argues that Woods' real target was not the rezone, but the R-3 zone in general.
¶ 15 To determine whether the superior court has subject matter jurisdiction to decide whether site-specific land use decisions comply with the GMA, we first examine the framework of the GMA and LUPA.
¶ 16 The legislature enacted the GMA in 1990 to address concerns related to "uncoordinated and unplanned growth" in the State and "a lack of common goals expressing the public's interest in the conservation and the wise use of our lands." RCW 36.70A.010. The GMA requires counties to develop a *31 "`comprehensive plan,'" which sets out the "generalized coordinated land use policy statement" of the county's governing body. Former RCW 36.70A.030(4) (1997). In essence, "[t]he comprehensive plan is the central nervous system of the GMA. It receives and processes all relevant information and sends policy signals to shape public and private behavior." Richard L. Settle, Washington's Growth Management Revolution Goes to Court, 23 Seattle U.L.Rev. 5, 26 (1999).
¶ 17 The comprehensive plan must designate an urban growth area (UGA) "within which urban growth shall be encouraged and outside of which growth can occur only if it is not urban in nature."[4] RCW 36.70A.110(1). The plan must also include a rural element, which may allow for a variety of rural densities, including clustering and density transfers. Former RCW 36.70A.070(5)(b) (2003). The rural element should foster land use that is "compatible with the use of the land by wildlife" and will "enhance the rural sense of community and quality of life," although the GMA acknowledges that "rural counties must have flexibility to create opportunities for business development." RCW 36.70A.011. The GMA also recognizes that circumstances may vary by county and allows counties to consider local circumstances when determining rural density and use patterns as long as they create a written record explaining how the rural element harmonizes with the GMA planning goals. Former RCW 36.70A.070(5)(a).
¶ 18 Along with a comprehensive plan, the GMA requires counties to adopt development regulations that are "consistent with and implement the comprehensive plan." RCW 36.70A.040(3)(d), (4)(d). "`Development regulations'" include, but are not limited to, zoning ordinances. Former RCW 36.70A.030(7) (1997). These regulations must be adopted within six months from the time of the comprehensive plan's adoption. WAC 365-195-810(1).
¶ 19 The legislature created three GMHBs in 1991 to hear petitions alleging violations of the GMA. RCW 36.70A.250, .280. GMHBs have limited jurisdiction to decide only petitions challenging comprehensive plans, development regulations, or permanent amendments to comprehensive plans or development regulations. Wenatchee Sportsmen, 141 Wash.2d at 178, 4 P.3d 123; RCW 36.70A.290(2). Petitions challenging whether a comprehensive plan or development regulation complies with the GMA "must be filed within sixty days after publication by the legislative bodies of the county or city." RCW 36.70A.290(2) (emphasis added).
¶ 20 GMHBs do not have jurisdiction to decide challenges to site-specific land use decisions because site-specific land use decisions do not qualify as comprehensive plans or development regulations. Former RCW 36.70A.030(7); RCW 36.70B.020(4); Wenatchee Sportsmen, 141 Wash.2d at 179, 4 P.3d 123. A challenge to a site-specific land use decision should be brought in a LUPA petition at superior court. Wenatchee Sportsmen, 141 Wash.2d at 179 n. 1, 4 P.3d 123.
¶ 21 LUPA grants the superior court exclusive jurisdiction to review a local jurisdiction's land use decisions, with the exception of decisions subject to review by bodies such as the GMHBs. RCW 36.70C.030(1)(a)(ii). The legislature's purpose in enacting LUPA was to "establish[ ] uniform, expedited appeal procedures and uniform criteria for reviewing [land use] decisions [by local jurisdictions],[[5]] in order to provide consistent, predictable, and timely judicial review." RCW 36.70C.010. A "`[l]and use decision'" is:
[A] final determination by a local jurisdiction's body or officer with the highest level of authority to make the determination, including those with authority to hear appeals, on:
(a) An application for a project permit or other governmental approval required by law before real property may be improved, developed, modified, sold, transferred, *32 or used, but excluding applications for permits or approvals to use, vacate, or transfer streets, parks, and similar types of public property; excluding applications for legislative approvals such as area-wide rezones and annexations; and excluding applications for business licenses.
RCW 36.70C.020(1). A site-specific rezone is a project permit, RCW 36.70B.020(4), and, thus, a land use decision.
¶ 22 Having established the statutory framework, we next examine our holding in Wenatchee Sportsmen to determine whether it supports Woods' claim that we explicitly recognized that the GMA and LUPA established two different avenues for review of a local jurisdiction's compliance with the GMA. Wenatchee Sportsmen involved Chelan County's approval of a developer's request to rezone its property and a subsequent subdivision plat application. 141 Wash.2d at 174, 4 P.3d 123. Wenatchee Sportsmen filed a LUPA petition in superior court challenging the county's approval of the subdivision, but not the earlier rezone. Id. The superior court concluded the subdivision constituted urban growth outside the county's interim UGA (IUGA)[6] under the GMA and reversed the county's approval. Id. at 174-75, 4 P.3d 123. The developer sought direct review of the superior court's decision with this court, which we granted. Id. at 175, 4 P.3d 123.
¶ 23 We addressed only the narrow question of whether the petitioner's challenge to the subdivision constituted a collateral challenge to the earlier site-specific rezone of the property. Id. at 175-77, 4 P.3d 123. In the course of our analysis, we observed that had the property owner timely challenged the earlier rezone, the superior court "could have considered whether the minimum density allowed by the [zoning ordinance] was compatible with the [county's] IUGA." Id. at 181-82, 4 P.3d 123. We also noted that having not timely challenged the rezone itself, "[t]he only issue that can be raised concerning the rezone is whether the plat application conforms to the zoning requirements." Id. at 182, 4 P.3d 123 (emphasis added). These two statements indicate that we viewed the superior court's jurisdiction as limited to determining whether the rezone complied with the applicable zoning requirements or the county's IUGA, but not the GMA.[7] The inference that we did not view the superior court's subject matter jurisdiction as extending to a review of compliance with the GMA is borne out by Justice Talmadge's vehement criticism of the majority for "ignor[ing] the GMA" in his dissenting opinion. Id. at 184, 4 P.3d 123 (Talmadge, J., dissenting).
¶ 24 However, Wenatchee Sportsmen also suggests that a superior court may have subject matter jurisdiction over whether a site-specific rezone complies with the GMA. We noted that "[i]f a GMHB does not have jurisdiction to consider a petition, it must be filed in superior court under LUPA." Id. at 178, 4 P.3d 123. More specifically, "[c]hallenges to a decision concerning a site-specific rezone should be brought by means of a LUPA petition in superior court." Id. at 179 n. 1, 4 P.3d 123. A GMHB does not have jurisdiction to hear a petition alleging that a site-specific rezone violates the GMA. See id. at 178, 4 P.3d 123. Thus, one could argue that a superior court has exclusive jurisdiction to determine whether the site-specific rezone complies with the GMA. The flaw in this reasoning is that the GMA does not explicitly apply to site-specific rezones and the GMA has no provision that it is to be liberally construed. Skagit Surveyors & Eng'rs, LLC v. Friends of Skagit County, *33 135 Wash.2d 542, 565, 958 P.2d 962 (1998).[8] Thus, the pivotal question is not whether the superior court has subject matter jurisdiction over challenges to project permits under the GMA, but whether there is statutory support for such a claim.
B. The GMA does not explicitly apply to site-specific rezones
¶ 25 It is unclear whether a site-specific rezone is statutorily required to comply with the GMA. The GMA does not directly regulate site-specific land use activities. Viking Props., Inc. v. Holm, 155 Wash.2d 112, 126, ¶ 31, 118 P.3d 322 (2005). The 13 planning goals, which include reducing sprawl, apply by their terms only to comprehensive plans and development regulations. See id. (noting that the GMA creates a "framework" that guides local jurisdictions in the development of comprehensive plans and development regulations); RCW 36.70A.020.
¶ 26 Thus, the GMA indirectly regulates local land use decisions through comprehensive plans and development regulations, both of which must comply with the GMA. See former RCW 36.70A.130(1)(a), (b) (2002). Comprehensive plans serve as "`guide[s]'" or "`blueprint[s]'" to be used in making land use decisions. Citizens for Mount Vernon v. City of Mount Vernon, 133 Wash.2d 861, 873, 947 P.2d 1208 (1997). Thus, a proposed land use decision must only generally conform, rather than strictly conform, to the comprehensive plan. Id. A comprehensive plan does not directly regulate site-specific land use decisions. Id.; Viking Props., 155 Wash.2d at 126, ¶ 31, 118 P.3d 322. Instead, local development regulations, including zoning regulations, directly constrain individual land use decisions. Viking Props., 155 Wash.2d at 126, ¶ 31, 118 P.3d 322. Such regulations must be consistent with the comprehensive plan and be sufficient in scope to carry out the goals set forth in the comprehensive plan. RCW 36.70A.040(3)(d), (4)(d); WAC 365-195-800(1).
¶ 27 A site-specific rezone authorized by a comprehensive plan is treated as a project permit subject to the provisions of chapter 36.70B RCW. RCW 36.70B.020(4). In reviewing a proposed land use project, a local government must determine whether the proposed project is consistent "with applicable development regulation, or in the absence of applicable regulations the adopted comprehensive plan." RCW 36.70B.030(1). While standards are explicitly provided for making the determination of whether a proposed project is consistent with the development regulations, or, in their absence, the comprehensive plan, there is no explicit requirement that the project permit be consistent with the GMA. See RCW 36.70B.030, .040. Instead, the land use planning choices reflected in the comprehensive plan and regulations "serve as the foundation for project review." RCW 36.70B.030(1).
¶ 28 This presents a potential problem. Assuming that a project permit must be consistent with development regulations or a comprehensive plan, there is the potential that the actual regulations or plan are not consistent with the GMA. As noted above, a comprehensive plan or development regulation's compliance with the GMA must be challenged within 60 days after publication. RCW 36.70A.290(2). Once adopted, comprehensive plans and development regulations are presumed valid. RCW 36.70A.320(1). Thus, if a project permit is consistent with a development regulation that was not initially challenged, there is the potential that both the permit and the regulation are inconsistent with the GMA. While this is problematic, the GMA does not explicitly apply to such project permits and the GMA is not to be liberally construed. Skagit Surveyors, 135 Wash.2d at 565, 958 P.2d 962. This court's "role is to interpret the statute as enacted by the Legislature . . . we will not rewrite the [GMA]." Id. at 567, 958 P.2d 962. Because the GMA does not provide for it, we hold that a site-specific rezone cannot be challenged for compliance with the GMA.
*34 C. Woods implicitly challenges the compliance of the comprehensive plan and development regulations with the GMA
¶ 29 The KCC explicitly requires that a site-specific rezone application be compatible with the comprehensive plan. Former KCC 17.98.020(E) (1996). If a zoning code explicitly requires that all proposed uses comply with a comprehensive plan, then the proposed use must comply with both the zoning code and the comprehensive plan. Cingular Wireless, LLC v. Thurston County, 131 Wash.App. 756, 770, 129 P.3d 300 (2006); see Weyerhaeuser v. Pierce County, 124 Wash.2d 26, 43, 873 P.2d 498 (1994). If a project permit is consistent with a comprehensive plan, then the only way that it could violate the GMA is if the plan itself violated the GMA. Thus, in this case, Woods' challenge to the rezone's compliance with the GMA is a disguised challenge to the adequacy of the comprehensive plan itself. This is a matter within the exclusive jurisdiction of a GMHB, not a superior court.
¶ 30 This reasoning is consistent with a Division One of the Court of Appeals case that determined that a superior court lacks subject matter jurisdiction to decide whether a project permit complied with the GMA. Somers v. Snohomish County, 105 Wash. App. 937, 21 P.3d 1165 (2001).
¶ 31 In Somers, a hearing examiner approved a developer's application for a new subdivision in Snohomish County and neighboring landowners filed a LUPA petition challenging the hearing examiner's decision, claiming the development constituted "urban growth" in violation of the GMA. 105 Wash. App. at 939, 21 P.3d 1165. The hearing examiner found that, although the proposed development was outside the county's IUGA and the ordinance establishing the IUGA did not adequately define "urban growth," the development was valid because it complied with the county's zoning ordinance. Id. at 940, 21 P.3d 1165. After determining it had subject matter jurisdiction to decide the matter, the superior court reversed the hearing examiner, holding that the subdivision constituted urban growth outside the IUGA in violation of the GMA. Id. at 941, 21 P.3d 1165. The Court of Appeals reversed, holding that although the Somerses claimed to challenge approval of the subdivision, their real claim was that the zoning ordinance violated the GMA by allowing urban growth outside the county's IUGA, a claim the superior court did not have subject matter jurisdiction to decide. Id. at 943-44, 21 P.3d 1165. CESS argues that, as in Somers, the superior court in this case did not have subject matter jurisdiction to decide that the R-3 zone allows urban growth outside the county's UGA in violation of the GMA. We agree.
¶ 32 Wenatchee Sportsmen and Somers demonstrate the hierarchical, rather than parallel, relationship between the GMA and LUPA. Comprehensive plans and development regulations provide the general structure for a local jurisdiction's site-specific decisions. The comprehensive plan and development regulations are presumed to comply with the GMA. The comprehensive plan and development regulations may be challenged for violations of the GMA before a GMHB within 60 days of publication. Subsequent site-specific land use decisions by a local jurisdiction must be generally consistent with the comprehensive plan and development regulations. An adjacent property owner must challenge a local jurisdiction's site-specific decisions by filing a LUPA petition in superior court. But a challenge to a site-specific land use decision can be only for violations of the comprehensive plan and/or development regulations, but not violations of the GMA. We affirm the Court of Appeals.
D. Woods' remaining LUPA issues are properly before us and BOCC properly approved CESS's site-specific rezone application
¶ 33 Because the superior court concluded that CESS's application for a site-specific rezone did not comply with the GMA, it declined to reach Woods' remaining LUPA issues. Although the parties put forward different reasons, both argue that this court should not reach those issues on appeal. But because we affirm the Court of Appeals holding that the superior court does not have subject matter jurisdiction to decide whether a site-specific rezone complies with the GMA, and because we stand in the superior court's *35 position on review of an administrative decision, Woods' remaining LUPA issues related to BOCC's decision to approve the site-specific rezone application are properly before us. See Wenatchee Sportsmen, 141 Wash.2d at 176, 4 P.3d 123.
¶ 34 An appellate court reviews an administrative decision under the substantial evidence standard and conclusions of law de novo. Id. "Under the substantial evidence standard, there must be a sufficient quantum of evidence in the record to persuade a reasonable person that the declared premise is true." Id.
¶ 35 Under LUPA, the party seeking relief has the burden of establishing that one of the following six standards has been met:
(a) The body or officer that made the land use decision engaged in unlawful procedure or failed to follow a prescribed process, unless the error was harmless;
(b) The land use decision is an erroneous interpretation of the law, after allowing for such deference as is due the construction of a law by a local jurisdiction with expertise;
(c) The land use decision is not supported by evidence that is substantial when viewed in light of the whole record before the court;
(d) The land use decision is a clearly erroneous application of the law to the facts;
(e) The land use decision is outside the authority or jurisdiction of the body or officer making the decision; or
(f) The land use decision violates the constitutional rights of the party seeking relief.
RCW 36.70C.130(1). "Issues raised under subsection (c) challenge the sufficiency of the evidence." Benchmark Land Co. v. City of Battle Ground, 146 Wash.2d 685, 694, 49 P.3d 860 (2002). In a challenge for sufficiency of the evidence, "`[w]e view inferences in a light most favorable to the party that prevailed in the highest forum exercising factfinding authority.'" Id. (quoting Schofield v. Spokane County, 96 Wash.App. 581, 588, 980 P.2d 277 (1999)). Therefore, we view the record and inferences in the light most favorable to CESS because they prevailed before BOCC.
¶ 36 Three basic rules apply to rezone applications: (1) they are not presumed valid, (2) the proponent of a rezone must demonstrate that there has been a change of circumstances since the original zoning, and (3) the rezone must have a substantial relationship to the public health, safety, morals, or general welfare. Citizens for Mount Vernon, 133 Wash.2d at 875, 947 P.2d 1208. Kittitas County imposes seven additional criteria for approval of a site-specific rezone application. Former KCC 17.98.020(E) (1996). The applicant must show that:
1. The proposed amendment is compatible with the comprehensive plan; and
2. The proposed amendment bears a substantial relation to the public health, safety or welfare; and

3. The proposed amendment has merit and value for Kittitas County or a sub-area of the county; and

4. The proposed amendment is appropriate because of changed circumstances or because of a need for additional property in the proposed zone or because the proposed zone is appropriate for reasonable development of the subject property; and

5. The subject property is suitable for development in general conformance with zoning standards for the proposed zone; and

6. The proposed amendment will not be materially detrimental to the use of properties in the immediate vicinity of the subject property; and

7. The proposed changes in use of the subject property shall not adversely impact irrigation water deliveries to other properties.
Id. (emphasis added).
¶ 37 In approving CESS's rezone application, BOCC found the requested zone change met all the criteria in former KCC 17.98.020(E), that is (1) the rezone was "consistent with the rural land use designation" of the county's comprehensive plan and the rural designation "has consistently been interpreted to be consistent with the Rural-3 *36 zoning designation," (2) the rezone had a "substantial relationship to the public health, safety or welfare,"[9] (3) the rezone had merit and value for the county because the potential for new tax lots will increase the county's tax base, (4) the proposed rezone was appropriate for reasonable development of the subject property given the surrounding zoning and development adjacent to the project area, which allow three acre densities,[10] (5) the property was suitable for development in conformance with R-3 zoning standards, (6) the rezone would not be materially detrimental to the use of properties in the immediate vicinity of the subject property because it limits the amount of permitted and conditional uses, and (7) proposed changes in the use of the property would not adversely impact irrigation water deliveries to other properties. CP at 174; Ex. 28.
¶ 38 Aside from Woods' GMA challenge discussed supra at pages 8-15, Woods' LUPA petition and supporting briefs challenged only findings related to criteria (1), (2), (4), and (5).
(1) The rezone is consistent with the rural land use designation in the county's comprehensive plan and the rural land use designation is consistent with the R-3 zone
¶ 39 Regarding inconsistency of the rezone with the county's comprehensive plan, Woods raised two main arguments in her briefs to the superior court.[11] First, she argued the county implemented its development regulations using preexisting zoning ordinances and individual rezones rather than implementing development regulations after adopting its comprehensive plan. Second, she argued the comprehensive plan does not provide for the R-3 zone classification in rural areas and the R-3 zone cannot qualify as rural based on rulings of the three GMHBs, which require five acre densities in rural areas.
¶ 40 CESS responded that the plan allows for the continued use of preexisting rural densities. It further contends that, although the plan acknowledges a generalization that a five acre density is associated with rural character, the topography of the county allows for a variety of lot sizes. CESS acknowledges its property is located in an area designated as rural but asserts it merely sought to rezone its property from one rural zone to another.
¶ 41 We first address Woods' claim that the rezone is invalid because the county continued to use preexisting zones and applied those zones to individual properties in rezones rather than implementing county-wide development regulations after adopting its comprehensive plan.[12]
*37 ¶ 42 Woods' premise seems to be that if a local jurisdiction does not adopt its development regulations after or in unison with its comprehensive plan, the development regulations do not implement the comprehensive plan. She implies there has been no prior opportunity to challenge whether the R-3 zone complies with the GMA. We sympathize with Woods' frustration over adjacent property owners' inability to challenge a local jurisdiction's actions, but the GMA does not provide her with the relief she seeks. We have held that the GMA does not authorize the GMHBs to review a county's preexisting development regulations for compliance with the GMA and invalidate any that do not comply. Skagit Surveyors, 135 Wash.2d at 567, 958 P.2d 962. Therefore, adjacent property owners have few alternatives to challenge a local jurisdiction's incorporation of a preexisting development regulation into its comprehensive plan under the GMA once the plan is adopted. Id.
¶ 43 Further, even if the GMHB were to determine that the comprehensive plan or development regulation is invalid, that determination is prospective in effect and would not extinguish rights that vested prior to the GMHB's order.[13] RCW 36.70A.302(2). Therefore, CESS's rezone has vested and any future invalidation of the R-3 zone or the county's comprehensive plan would have no effect on it.
¶ 44 Because we conclude the county validly adopted the R-3 zone into its comprehensive plan, the only issue before us is whether the county's comprehensive plan permits the R-3 zone to be used in rural areas. Woods argues it does not.
¶ 45 The county's comprehensive plan states that rural densities range from 3 to 20 acres and expressly refers to the creation of the R-3 zone in its discussion of rural lands. Former Kittitas County Comprehensive Plan (2001) at 178. The rural section of the comprehensive plan contains a reference to chapter two, in which the R-3 zone is included on a list of zones approved for use in the county. Id. The comprehensive plan discusses the need for rural diversity at length, stating:
The aforementioned range of rural densities and uses has created and contributed to a successful landscape which contributes to an attractive rural lifestyle. The exception to this landscape can be seen in areas where individuals have had to acquire larger lots than desired in order to obtain a building site. This has created the effect of "rural sprawl." This current mix of rural uses and densities has not increased the cost to taxpayers for road and utility improvements, police and fire protection, or the education of school populations beyond the means of the local people to finance such infrastructure. The mix of rural uses and densities have [sic] allowed rural growth to be accommodated in a variety of areas where it is appropriate. This has been compatible with both resource activities and urbanization.
Id.
¶ 46 Although, as Woods notes and CESS acknowledges, the county's plan indicates that five acre minimum lot sizes are generally viewed as preserving the rural nature of the area, the plan also expresses concern that a focus on lot size alone could lead to rural sprawl. Id. at 176. It states:
There exists a generalization that 5 acre minimum lot sizes might preserve "rural character." . . . However, over the past fifteen to twenty years Kittitas County has experienced "rural sprawl" through the adoption of 20 acre minimum lot sizes, which has caused the conversion of farm land into weed patches. Small lot zoning with conservation easements for agriculture, timber, or open space may be preferable to the wasteful "sprawl" developments of large lot zoning and could be more conducive to retaining rural character. . . . In Kittitas County there are rural settlements of all sizes and descriptions, some *38 resembling small towns and others simple "crossroads cluster." While attaining higher densities, these areas remain rural in character.
Id.
¶ 47 Woods conspicuously does not point to any language that restricts the use of the R-3 zone to urban areas. The most she can demonstrate is that the plan acknowledges a common perception that five acres is generally viewed as rural. Other language in the plan, though, plainly demonstrates that the county explicitly rejected the bright-line rule that a five acre density is required for rural land and arrived at a reasonable decision based on the county's specific needs.
¶ 48 Because the county's comprehensive plan expressly recognizes the R-3 zone as a rural zone, BOCC's approval of a rezone of rural land from F & R to R-3 did not violate the county's comprehensive plan and was not an erroneous interpretation of the law or a clearly erroneous application of the law to the facts.
(2) The rezone had a substantial relationship to the public health, safety, or welfare
¶ 49 Woods claimed next that the rezone did not have a substantial relationship to public health, safety, or welfare because she claimed the record conclusively showed there was a lack of available water on CESS's property.
¶ 50 The record indicates that the Department of Ecology (DOE) was concerned about the potential that there would be inadequate water for development on CESS's property, but potential inadequacy is a far cry from conclusive evidence. The record also shows the county took note of DOE's concerns and established mitigation measures to ensure that if and when a project development application was submitted, DOE's concerns would be addressed before any development occurred.
¶ 51 Moreover, BOCC based its decision that the rezone had a substantial relationship to the public health, safety, or welfare on the fact that F & R zone permits more intense conditional uses than those permitted in the R-3 zone. It found that while such uses might be appropriate in areas where lots are predominately 20 acres in size, much of the area surrounding CESS's property is already zoned R-3 or it is zoned F & R but contains many 3 acre lots.
¶ 52 We conclude that there is substantial evidence in the record to support BOCC's decision that the rezone to R-3 would have a substantial relationship to the public health, safety, or welfare, and BOCC's decision was not an erroneous interpretation of the law or a clearly erroneous application of the law to the facts.
(4) The proposed rezone was appropriate for reasonable development of the subject property given three acre zoning in the surrounding area
¶ 53 Woods also claimed the rezone was not valid because there had been no change in circumstances. She argued there was no change in circumstances because there was no need for additional residential property in the area. CESS argued that, although under LUPA a rezone proponent must generally show that there has been a change of circumstances since the original zoning, former KCC 17.98.020(E)(4) alternatively allows the proponent to show the rezone is appropriate for reasonable development of the subject property.
¶ 54 CESS's rezone application stated that the purpose of the rezone was to permit future residential development characteristic of the surrounding area and provide a transition zone between the F & R zone and the outlying commercial forest zone. It also stated that the property is former timberland that has since been subdivided into parcels ranging from 8 to 84 acres and is no longer appropriate for commercial forestry. Woods failed to explain why a rezone of the property to R-3 is inappropriate for reasonable development of property so described. She stated that there is already capacity for 7,483 dwelling units on existing R-3 zoned districts and there is no need for 70 additional residential lots. However, she did not explain why current capacity elsewhere in the county would preclude creation of additional capacity on, or render the rezone inappropriate for, reasonable *39 development of a particular property. Moreover, in reaching its decision, BOCC reasoned that because adjacent properties also allowed a three acre density, it was not inappropriate to approve the same density for CESS's property.
¶ 55 We conclude there is substantial evidence in the record to support BOCC's decision that because the surrounding area is already a mix of F & R and R-3, a rezone is appropriate for reasonable development, and BOCC's decision was not an erroneous interpretation of the law or a clearly erroneous application of the law to the facts.
(5) The rezone was suitable for development in conformance with R-3 zoning standards
¶ 56 Finally, Woods claimed the record established conclusively that, because there is inadequate water to support increased density and the topography of the area precluded adequate traffic capacity, the rezone was not suitable for development. Although the Kittitas County Department of Public Works and DOE expressed concerns regarding the impact of the rezone on traffic and water availability, BOCC reasoned that a determination that the property was not suitable for development is pertinent only where an application is submitted to develop the property. The county had established mitigation measures to ensure that if and when a project development application was submitted, those issues would be taken into account.
¶ 57 We conclude there is substantial evidence in the record to support BOCC's decision that the property is suitable for development. BOCC's decision was supported by substantial evidence and was not an erroneous interpretation of the law or a clearly erroneous application of the law to the facts.

IV. CONCLUSION
¶ 58 We affirm the Court of Appeals. We hold that the superior court erred in concluding that it had subject matter jurisdiction under LUPA to decide whether a site-specific rezone complies with the GMA. The superior court has jurisdiction only to determine whether a site-specific rezone complies with the county's comprehensive plan and/or development regulations. We further conclude Woods' remaining LUPA issues are properly before us and hold that BOCC's decision to approve CESS's site-specific rezone application was supported by substantial evidence and was not an erroneous interpretation of the law or a clearly erroneous application of the law to the facts.
WE CONCUR: Chief Justice GERRY L. ALEXANDER, Justice CHARLES W. JOHNSON, Justice BARBARA A. MADSEN, Justice RICHARD B. SANDERS, Justice BOBBE J. BRIDGE, Justice SUSAN J. OWENS and Justice JAMES M. JOHNSON.
BECKER, J.[*] (concurring).
¶ 59 I concur that there is no forum in which to challenge a site-specific rezone on the basis that it improperly allows urban growth to be located in a rural area. I am reluctant to hold that the superior court committed error when the court simply followed Wenatchee Sportsmen Ass'n v. Chelan County, 141 Wash.2d 169, 4 P.3d 123 (2000). But there is no statutory support for allowing a superior court to apply the Growth Management Act (GMA) (chapter 36.70A RCW) directly to a project permit. If a county's comprehensive plan and development regulations are so weak that they cannot protect rural lands from urban density rezones and therefore do not comply with the GMA, the problem must be anticipated and brought before one of the Growth Management Hearings Boards.
¶ 60 Under the GMA counties must adopt a comprehensive plan and development regulations. The development regulations must be consistent with and implement the county's comprehensive plan. RCW 36.70A.040(3). The comprehensive plan must contain certain elements, including measures to protect the rural character of rural areas. RCW 36.70A.070(5)(c). The county must *40 designate an urban growth area, outside of which growth can occur only if it is not urban in nature. RCW 36.70A.110. When a county's comprehensive plan and development regulations comply with the GMA, then project permit decisions that are consistent with the plan and regulations will also comply with the GMA.
¶ 61 Here, the Kittitas County Commissioners decided it was consistent with their comprehensive plan to reclassify some 250 acres from the Forest and Range zone (where the minimum lot size is 20 acres) to the R-3 zone (where the minimum lot size is 3 acres). The acreage in question, previously part of a timber company's holdings that were broken into smaller tracts after being harvested, is located south of Cle Elum. Cecile Woods, a neighboring landowner, brought a land use petition asserting that the rezone was unlawful because it allowed for urban density in a rural area, contrary to the GMA.
¶ 62 Woods had good reason to think that the superior court was authorized by statute to decide whether the site-specific rezone complied with the GMA. According to Wenatchee Sportsmen, a party "must initially appeal a land use decision of the kind involved here" to either a Growth Management Hearings Board or else to superior court under the Land Use Petition Act (LUPA), chapter 36.70C RCW. Wenatchee Sportsmen, 141 Wash.2d at 178, 4 P.3d 123. The growth boards only have jurisdiction to review comprehensive plans and development regulations for compliance with the GMA. They do not have jurisdiction to review site-specific rezones. Wenatchee Sportsmen, 141 Wash.2d at 178-79, 4 P.3d 123. Therefore, an argument that a particular site-specific rezone violates the GMA has to be "raised in a timely LUPA challenge to the rezone." Wenatchee Sportsmen, 141 Wash.2d at 181, 4 P.3d 123.
¶ 63 The rural land in question in Wenatchee Sportsmen was rezoned in 1996 to RR-1, which permitted density of one dwelling per acre. The Sportsmen did not challenge the 1996 rezone. In 1998, the county approved a subdivision on this land with one-acre lots. The Sportsmen brought a LUPA challenge in superior court claiming that the subdivision impermissibly authorized urban growth outside the urban growth area boundary. On that basis, the superior court reversed the subdivision. But this court agreed with the developer that the Sportsmen were barred because they had not challenged the original rezone to the RR-1 designation. Because the original rezone was a project permit decision, they could not have challenged it by a petition to the growth board, but they could have done so in a timely LUPA petition brought within 21 days of the decision.
At that time a court reviewing the rezone decision could have considered whether the minimum density allowed by the RR-1 district was compatible with the IUGA.[[1]] If there is no challenge to the decision, the decision is valid, the statutory bar against untimely petitions must be given effect, and the issue of whether the zoning ordinance is compatible with the IUGA is no longer reviewable.
Wenatchee Sportsmen, 141 Wash.2d at 181-82, 4 P.3d 123.
¶ 64 Cecile Woods did exactly what Wenatchee Sportsmen directed her to do: she challenged the site-specific rezone decision in a LUPA petition within the 21-day time limit. She did not wait until the rezone led to an actual plat approval. The trial court read Wenatchee Sportsmen and concluded, reasonably, that Woods had come to the correct forum to allege that the rezone was incompatible with the urban growth boundary.
¶ 65 The majority characterizes Wenatchee Sportsmen as having decided "only the narrow question" of whether the 1998 land use petition was a collateral challenge to the 1996 rezone decision. Majority at 13. I do not think the rest of the opinion can be so easily pushed aside. The underlying premise was that there must be some forum for reviewing county decision-making for lack of compliance with the GMA  either the growth board, or if not, then the superior court. If the county decision is a development regulation such as a zoning ordinance, then the *41 appropriate forum will be the growth board. But according to Wenatchee Sportsmen, when the county decision is a site-specific rezone, the superior court is the appropriate forum because the growth board does not have jurisdiction.
¶ 66 One application of Wenatchee Sportsmen is found in Somers v. Snohomish County, 105 Wash.App. 937, 21 P.3d 1165 (2001). Like in Wenatchee Sportsmen, the issue in Somers was the lawfulness of a subdivision located outside an urban growth area. The county approved the subdivision because it was in compliance with a residential zone (R-20,000) that was already applicable to the property at the time the application vested in 1994. Somers should have petitioned the growth board for a ruling that the R-20,000 zone in a rural area is an improper development regulation under the GMA. Instead, just like in Wenatchee Sportsmen, Somers waited until the zoning led to a subdivision, then filed a LUPA petition challenging the subdivision approval. This he was not permitted to do. His LUPA petition was a collateral attack upon a zoning ordinance that could have been earlier subjected to review by the growth board. "Although the Somers LUPA petition does not expressly challenge the underlying zoning as contrary to the GMA, it does so implicitly." Somers, 105 Wash.App. at 945, 21 P.3d 1165.
¶ 67 Respondents argue that Woods likewise implicitly challenges the underlying zoning. They say her LUPA petition is a disguised attack on the R-3 zone that she should have raised earlier with the growth board. But factually, this case is not like Somers. The underlying zoning applicable to the property was Forest and Range with a minimum lot size of 20 acres. Woods was satisfied with that zoning and had no reason to challenge it as violating the GMA.
¶ 68 And she also had no reason to petition the growth board to do away with the R-3 zone. The R-3 zone in Kittitas County is merely the ordinance defining the uses and densities permitted in land zoned R-3. Woods has no objection if the county applies the R-3 zone to land in unincorporated areas within the urban growth areas. What Woods contests is the county's decision to apply the R-3 zone to the subject site, outside the urban growth area.
¶ 69 The comprehensive plan designated all lands outside the urban growth areas as "Rural." The plan's description of the Rural Lands does not identify R-3 zoning or any other zoning classification as desirable for new development in the Rural Lands. It simply recognizes R-3, along with Forest and Range and several other classifications, as among the zones represented by existing land use patterns in the Rural Lands. There is no statement in the comprehensive plan that the county planned on allowing more R-3 development to occur in the future, much less any criteria defining where it might occur. Only when the owners proposed a rezone did it become apparent that the R-3 zone had, as the trial court put it, "the potential to turn a rural area into an area of urban growth densities."[2] The rezone was the first and only time that the actual change of density on the subject site could have been challenged by adjacent property owners or the community as violating the GMA.
¶ 70 As this case demonstrates, the ad hoc nature of a site-specific rezone can make it something of a loose cannon. If Kittitas County had adopted an area-wide zoning ordinance attaching the R-3 zone to a broader area of logged-off lands in northern Kittitas County, that would have presented a situation like in Somers. Woods would have been put on notice that R-3 subdivisions would be approved on her neighboring lands, and she could have tried to prevent that from happening by asking the growth board to determine that the ordinance violated the GMA. It is anomalous that a decision to attach the R-3 zone to a single parcel of 250 acres would not also be subject to review for GMA compliance; obviously, a series of such rezones, parcel by parcel, will eventually add up and have the same effect as an area-wide zoning ordinance. In this light, it is a fair reading of Wenatchee Sportsmen that when a rezone allows urban densities that the county did not specifically plan for and neighbors had no reason to anticipate, its compliance with the *42 GMA is an issue that can be raised in a LUPA petition. Because Somers does not involve a site-specific rezone, it does not necessarily point to a different conclusion.
¶ 71 Nevertheless, I believe the majority correctly analyzes the statute. It has become increasingly clear that there simply is no statutory provision allowing the GMA to be applied directly to a specific site at the project permit level. Every time a superior court has reversed a county project permit decision on the basis of noncompliance with the GMA, our appellate courts have reinstated the county decision. See, e.g., Assoc. of Rural Residents v. Kitsap County, 141 Wash.2d 185, 4 P.3d 115 (2000); Caswell v. Pierce County, 99 Wash.App. 194, 992 P.2d 534 (2000); Somers, 105 Wash.App. at 937, 21 P.3d 1165. An allegation that a county decision violates the GMA by allowing urban growth in a rural area cannot be decided in a LUPA petition-even if, like a site-specific rezone, the decision is incapable of being appealed to the growth board. To the extent that Wenatchee Sportsmen states that the GMA issue can be raised in a LUPA petition, it is incorrect. And to the extent that such a statement in Wenatchee Sportsmen is an actual holding (as opposed to mere dicta), the court should overrule that aspect of the case as being not only incorrect but harmful.[3]
¶ 72 The harm lies in the prospect of inconsistent interpretation and application of the GMA. The harm of inconsistency may not exist here because the ruling Woods sought from the superior court, that the GMA requires a five-acre minimum lot size for rural development, can easily be recognized as consistent with decisions by all three growth boards. But in another case, nothing would prevent a LUPA petitioner from arguing, and a trial court from deciding, that to protect the rural character of a particular area the minimum lot size had to be at least 10 acres. And the two different lines of authority, one arising from the regional growth board and one from the local court, would bring chaos to a county's administration of its obligations under the GMA.
¶ 73 The eastern Washington board recently responded to a petition alleging that the Kittitas County comprehensive plan as amended in 2006 was in violation of the GMA for failing to eliminate densities greater than one dwelling unit per five acres in the rural area. Kittitas County Conservation v. Kittitas County, No. 07-1-0004c, Final Dec. and Order 6 (E. Wash. Growth Mgmt. Hr'gs Bd. Aug. 20, 2007). Relying on extensive research and study conducted by all three boards, the board found that the density allowed by the R-3 zone was an urban density. Kittitas County Conservation at 17. The board also found that Kittitas County had "failed to adopt specific, directive policies in the CP [Comprehensive Plan] . . . for determining when and where rezone applications should be approved". Kittitas County Conservation at 83. As a result, the plan has been remanded to the county with directions to solve these and other problems in a way that complies with the GMA. Kittitas County Conservation at 85.
¶ 74 Unfortunately for Woods, the board's decision is prospective in application and will not reverse the site-specific rezone to neighboring forest land that prompted the filing of her LUPA petition. But the board's decision does demonstrate that the jurisdiction of the growth boards provides an opportunity to plug what would otherwise be a big loophole undermining the intent of the GMA. While there is no forum that can overturn a site-specific rezone as being in violation of the GMA, a county with weak standards governing rezones is subject to enforcement action by the growth board for failing in its obligation to take measures protecting the rural character of its rural lands. RCW 36.70A.070(5)(c). This mechanism is not self-executing and it is not a fail-safe antidote to sprawl. But it does create an avenue for review that in the long run is likely to produce more consistent and predictable GMA case law than the alternative of review under LUPA.
NOTES
[1] Relevant sections of the Kittitas County Code were amended and renumbered in 2004. We cite to the former version of the Kittitas County Code that the parties cited to in their briefs to the superior court. See Clerk's Papers at 111-18; ch. 17 KCC, available at http://www.co.kittitas.wa.us/boc/countycode/title17.asp (last visited Dec. 18, 2007).
[2] The third claim related to Woods' argument that there is inadequate water and traffic capacity on CESS's land.
[3] Woods also raised two additional claims in her petition that are not on appeal and we do not reach.
[4] The parties agree that CESS's property was located outside the City of Cle Elum's UGA and in an area designated on the county's comprehensive plan as rural.
[5] "`Local jurisdiction[s]'" include counties, cities, and incorporated towns. RCW 36.70C.020(2).
[6] Cities and counties that were required to or that elected to plan under the GMA were required to adopt IUGAs pending completion of their comprehensive plans and development regulations and final UGAs when the comprehensive plan was adopted. RCW 36.70A.110(5).
[7] Subdivision plat applications and petitions for site-specific rezones are both "project permit applications." RCW 36.70B.020(4). Site-specific rezones authorized by a comprehensive plan are treated differently from amendments to comprehensive plans or development regulations. See id. A site-specific rezone occurs "when there are specific parties requesting a classification change for a specific tract." Cathcart-Maltby-Clearview Cmty. Council v. Snohomish County, 96 Wash.2d 201, 212, 634 P.2d 853 (1981). Unlike project permit applications, amendments to the comprehensive plan and development regulations must conform to the GMA. See RCW 36.70A.130(b).
[8] "The courts seem to recognize that . . . GMA was spawned by controversy, not consensus. The relative spheres of state mandate and local autonomy were the product of extremely difficult legislative compromise. It is no accident that the GMA contains no provision for liberal construction." Settle, supra, at 34.
[9] BOCC noted earlier in its findings that the R-3 zone did not allow high intensity uses such as asphalt plants, landfills, log sorting yards, airports, or sawmills, all of which are conditionally allowed in the F & R zone. CP at 173.
[10] BOCC noted earlier in its findings that the R-3 zoning to the north of this property and the many properties to the east are zoned F & R, but contain lots more consistent with R-3 zoning. CP at 173.
[11] Although we refer to the county's decision as a rezone, Woods referred to it alternatively as a "rezone" and an "amendment" in her briefs to the superior court. See CP at 98, 103-05, 107. Former KCC 17.98.020(E) refers to a proposed site-specific rezone as an "amendment," it is clear from the code section in which the term is used that the proposed change will affect only the zoning for a particular propertyit does not amend the zone itself, the code section or the county's comprehensive plan. A separate section of the county code addresses amendments to county plans, codes, and standards. See Title 15B KCC.
[12] We note that at oral argument before this court, Woods' counsel indicated that a suit is pending before the Eastern Washington GMHB challenging the county's reliance on preexisting zoning regulations rather than regulations implemented subsequent to adoption of its comprehensive plan. Wash. State Supreme Court oral argument, Woods v. Kittitas County, No. 78331-4 (Jan. 25, 2007), audio recording by TVW, Washington State's Public Affairs Network, available at http://www.tvw.org. During the pendency of this case, the board ruled that the county failed to adopt proper regulations for the implementation of the comprehensive plan. Kittitas County Conservation v. Kittitas County, No. 06-01-0011, Final Dec. and Order 2 (E. Wash. Growth Mgmt. Hr'g Bd.) (EWGMHB) (Apr. 3, 2007). In a subsequent case, the board noted that development regulations were adopted by the county on July 19, 2007. Kittitas County Conservation v. Kittitas County, No. 07-1-0004c, Final Dec. and Order 40 (EWGMHB) (Aug. 20, 2007).
[13] The GMHB held portions of the 2006 Comprehensive Plan to be invalid in Kittitas County Conservation, EWGMHB, No. 07-1-0004c. The board determined that the density allowed under R-3 constituted an urban density, which is prohibited by the GMA. Id. at 16. The county was found to be noncompliant in this regard and was ordered to take necessary actions to ensure compliance with the GMA. See id. at 17, 85-86. Only the portions of the comprehensive plan dealing with the de-designation of certain agricultural lands were found to be invalid. Id. at 81.
[*] Judge Mary Kay Becker is serving as a justice pro tempore of the Supreme Court pursuant to Washington Constitution article IV, section 2(a).
[1] Interim Urban Growth Area.
[2] Br. of Resp't at 37.
[3] Before a decision may be overruled, it must be shown to be both incorrect and harmful. 1000 Friends of Wash. v. McFarland, 159 Wash.2d 165, 176, 149 P.3d 616 (2006).