245 P.3d 789 (2011)
BRINNON GROUP, a Washington nonprofit corporation; and Brinnon MPR Opposition, a Washington nonprofit corporation, Appellants,
v.
JEFFERSON COUNTY; Statesman Group of Companies Ltd.; Black Point Properties LCC; G.P. Byrkit; P & N Byrkit Family Trust; Palmer and Nancy Byrkit; William Kaufman; VF Manke Trust; Joan Manke; Charles and Judith Manke; Hal and Janice Richards; and State Department of Natural Resources, Respondents, and
Western Washington Growth Management Hearings Board, an administrative agency; Jefferson County; a political subdivision of the State of Washington; Pleasant Harbor Marina and Golf Resort, LLP; and Pleasant Harbor Marina, LLC, Respondents.
Nos. 39071-0-II, 39491-0-II.
Court of Appeals of Washington, Division 2.
January 19, 2011.
*793 Gerald Barclay Steel, Attorney at Law, Olympia, WA, for Appellant.
David W. Alvarez, Jefferson Co. Pros. Atty., Jefferson Co. Courthouse, Port Townsend, WA, John T. Cooke, Alexander Weal Mackie, Perkins Coie LLP, Seattle, WA, Christa L. Thompson, Atty. Gen. Ofc. Nat. Res. Div., Olympia, WA, for Respondents.
PENOYAR, C.J.
¶ 1 In January 2008, Jefferson County (County) enacted an ordinance that amended its comprehensive plan to permit the development of a master planned resort (MPR) near Brinnon, Washington. Brinnon Group and Brinnon MPR Opposition[1] challenged the ordinance by filing (1) a petition for review with the Western Washington Growth Management Hearings Board (Board) and (2) a complaint for a constitutional and statutory writ in Clallam County Superior Court. The Board concluded that the County's ordinance had complied with provisions of the Growth Management Act (GMA), chapter 36.70A RCW; the Planning Enabling Act (PEA), chapter 36.70 RCW; and the State Environmental Policy Act (SEPA), chapter 43.21C RCW. Thurston County Superior Court affirmed the Board's order. Clallam County Superior Court dismissed the complaint for a constitutional and statutory writ after concluding that judicial review of the Board's decision offered Brinnon Group an adequate remedy to address its contentions that the County had violated the PEA. In this consolidated appeal, Brinnon Group appeals Thurston County Superior Court's affirmance of the Board's order and Clallam County Superior Court's dismissal of its complaint. We affirm the judgments of both superior courts.

FACTS

I. BACKGROUND
¶ 2 The GMA limits urban growth to designated urban growth areas. See RCW 36.70A.110(1).[2] Participating counties, however, *794 may allow an exception to this rule by authorizing an MPR. RCW 36.70A.360(1). An MPR is "a self-contained and fully integrated planned unit development, in a setting of significant natural amenities, with primary focus on destination resort facilities consisting of short-term visitor accommodations associated with a range of developed on-site indoor or outdoor recreational facilities." RCW 36.70A.360(1).
¶ 3 In 2002, Jefferson County adopted the Brinnon Subarea Plan, which identified over 300 acres south of Brinnon as a "conceptual" MPR location. Administrative Record (AR) at 197. Brinnon is an unincorporated village near Highway 101 about 35 miles south of Port Townsend. The County apparently incorporated the subarea plan into its comprehensive plan.
¶ 4 The acreage that the County identified in the Brinnon Subarea Plan covered much of Black Point, an area of land that extends into Hood Canal immediately south of Pleasant Harbor. The acreage included multiple properties and owners. In the County's view, Black Point's existing "recreational and visitor support activities," including two marinas, a recreational vehicle park, and other service-oriented businesses, made the area appropriate for an MPR. AR at 900.
¶ 5 The County's comprehensive plan and the county code include specific policies to guide MPR. development. See RCW 36.70A.360(4)(a) (requiring that counties adopt such policies before authorizing MPRs). Proposed MPR site owners must seek to amend the Comprehensive Plan Land Use Designations Map "prior to, or concurrent with an application for master plan review." AR at 371; See also Jefferson County Code (JCC) 18.15.126(3). Additionally, the amendment process should evaluate the proposal's probable significant adverse impacts "even if the proposal is to be developed in phases." AR at 371.
¶ 6 Significantly, for purposes of this appeal, the County's comprehensive plan also states that a comprehensive plan amendment must conform to the GMA's and the PEA's requirements. The County must process site-specific comprehensive plan amendments "pursuant to the procedures contained within [the PEA] and the Jefferson County development regulations." AR at 378.

II. STATESMAN'S APPLICATION
¶ 7 In March 2006, the Statesman Group of Companies, Ltd. (Statesman) applied for a site-specific comprehensive plan amendment in order to develop an MPR on approximately 251 acres in the conceptual MPR area. Statesman's application included language for a proposed comprehensive plan amendment and detailed maps of specific portions of the proposed MPR.

A. ENVIRONMENTAL IMPACT STATEMENTS
¶ 8 On September 5, 2007, the County issued a draft Environmental Impact Statement (draft EIS) for the MPR project. The draft EIS identified two components to Statesman's proposed MPR: (1) a 220 +-acre golf course and resort east of Highway 101 and south of Black Point Road, and (2) a 37 +-acre marina and a maritime village east of Highway 101 and north of Black Point Road. Under the proposal, Statesman would redevelop the northern portion of the existing marina into a "Maritime Village" with stores, restaurants, and a pedestrian promenade and would retain and refurbish the existing marina. AR at 1724. The draft EIS reduced the number of residential units from 1,270, the number in Statesman's application, to 890 units.
¶ 9 The draft EIS acknowledged that Statesman's proposed MPR fit within the subarea plan's conceptual MPR boundary. The draft EIS noted that the proposed MPR consisted of property that Statesman owned in addition to 15.2 acres of leased tidelands owned by the Department of Natural Resources (DNR).
¶ 10 Unlike Statesman's site-specific application, the draft EIS did not include a proposed text amendment to the County's comprehensive plan. Instead, the draft EIS included a section entitled "Summary of the *795 Proposal and Permitting Limitations," which stated in relevant part:
The drawings shown are conceptual, but any development must substantially reflect the orientation, layout, and composition of the proposal. Mandatory elements of any application shall include:
 Total acres
 Golf side220 ± acres
 Marina side37 ± acres upland and 15.2 ± acres tidelands
 Total units 890 project limits
 Golf side739 units
 52 staff apartments
 Not more than 68 units (10% of resort properties) as permanent residences, plus any units transferred from the marina side
 Not more than 40% of resort units for long-term tourist use (seasonal stays not to exceed six months)
 At least 50% of resort units in short-term tourist pool
 Marine [sic] sideno more than 151 units
 Not more than 16(10%) permanent residences (may be shifted to golf course side, but total permanent residences shall not exceed 84 units)
 Not more than 30% seasonal tourist, not to exceed six months
 At least 60% in short-term tourist pool
 Impervious surface
 Golf side20%
 Marina side40%
AR at 1728.
¶ 11 The draft EIS also included three alternatives to Statesman's proposal in order to comply with SEPA. See RCW 43.21C.030(c)(iii). The "no action" alternative would permit Black Point to develop under current zoning regulations while the other two alternativesthe Brinnon Subarea Plan alternative and the hybrid alternative would permit the MPR to develop on the full 310 acres that the subarea plan identified. Properties outside the areas of Statesman's proposal would develop at urban resort densities under the Brinnon Subarea Plan alternative and at rural residential densities under the hybrid alternative.
¶ 12 The County published a "Notice of Intent to Amend Comprehensive Plan" and ultimately received 413 written comments. AR at 1363. Of those individuals expressing an opinion, 127 favored the MPR and 112 opposed it. Brinnon Group submitted written comments in opposition, requesting that the County authorize fewer than 890 residential units, reduce the golf course from 18 to 9 holes, and preserve 50 percent (instead of 35 percent) of the land's natural space. Brinnon Group's comments addressed numerous other issues such as landscaping, tree removal, protecting water sources, and traffic.
¶ 13 On November 21, the County published a notice in the local newspaper that the Board of County Commissioners (BOCC) would hold a public hearing on December 3 to consider the MPR comprehensive plan amendment. The notice informed the public to contact the Community Development Department "[f]or further information." AR at 1555.
¶ 14 On November 27, the County issued the final Environmental Impact Statement (final EIS). The final EIS included the County's responses to the written public comments.

B. AMENDMENT TO COMPREHENSIVE PLAN
¶ 15 On November 28, a majority of the Planning Commission (the Commission) voted to recommend to the BOCC that it approve the proposed comprehensive plan amendment. The Commission's chairman signed the majority recommendation. The Commission's recommendation included seven conditions and a map that explicitly referenced these seven conditions in a descriptive box. The Commission's map divided the proposed MPR into four categories (marina, open space, resort district, and tourist commercial). The Commission's chairman and secretary did not sign the Commission's recommended map until January 8, 2008.
¶ 16 After a public hearing before the BOCC, County staff informed the BOCC in a Powerpoint presentation that MPR development would occur in five phases. In phase *796 one, the County would amend the comprehensive plan and create environmental impact statements. In phase two, the County would adopt relevant zoning regulations and development agreements, including land use and density requirements. In phase three, the County would process development permit applications. In phase four, the County would record plats and allow infrastructure construction. In phase five, the County would issue building permits.
¶ 17 On January 28, 2008, the BOCC enacted Ordinance 01-0128-08. For purposes of this appeal, the ordinance amended the County's comprehensive plan in three significant ways. First, section one of the ordinance amended the Comprehensive Plan Land Use Designations map to reflect an underlying land use designation of MPR for parcels included in the Statesman proposal. Second, section two of the ordinance added the following text to the comprehensive plan:
Early in 2008, Jefferson County designated a new Master Planned Resort (MPR) in Brinnon. The new Master Planned Resort is 256 acres in size and includes the Pleasant Harbor and Black Point areas. The Marina area is existing and would be further developed to include additional commercial and residential uses such as townhouses and villas. The Black Point area of the new resort would include new facilities such as a golf course, a restaurant, a resort center, townhouses, villas, staff housing, and a community center. The overall residential construction would not exceed 890 total units.
AR at 1638. Third, section five of the ordinance incorporated the MPR boundary map that the BOCC attached to the approved ordinance into the comprehensive plan.
¶ 18 Ordinance 01-0128-08 also placed 30 conditions on the MPR development in finding 63. These conditions included identical or slightly altered versions of the seven conditions that the Commission included in its November 28 majority recommendation.[3] The BOCC stated that it adopted these conditions pursuant to SEPA and its general police powers.

III. BRINNON GROUP'S CHALLENGES TO THE ORDINANCE
¶ 19 Brinnon Group challenged the ordinance in two forums. On February 19, Brinnon Group filed a complaint for constitutional writ of certiorari and statutory writ of review in Clallam County Superior Court, asking the court to void the ordinance. The complaint, which named Statesman and the County as defendants, alleged that the County had failed to comply with the GMA's and PEA's requirements. Brinnon Group sought a constitutional writ of certiorari because it had "no other adequate remedy at law" to review the County's compliance with the PEA. Clallam Clerk's Papers (CCP) at 315. The complaint stated that Brinnon Group planned to exhaust its administrative remedies by filing a petition for review with the Board in order to address the County's alleged GMA and SEPA violations.
¶ 20 On March 19, Brinnon Group filed a petition for review with the Board, alleging that the County had failed to comply with the GMA and SEPA. The Board subsequently permitted Pleasant Harbor Marina and Golf Resort, LLP, the purchaser of the affected property, and Pleasant Harbor Marina, LLC, the purchaser of the affected marina, to intervene in proceedings. In its opening brief, Brinnon Group argued that the County's non-compliance with specific PEA provisions violated the County's public participation program under the GMA because, as noted above, the County's comprehensive plan explicitly states that the County must comply with the PEA when amending its comprehensive plan.

A. THE BOARD'S DECISION ON THE PETITION FOR REVIEW
¶ 21 On September 15, the Board entered an order that the County had complied with the GMA when it enacted Ordinance No. 01-0128-08. The Board also concluded that the County had complied with SEPA. With regard *797 to Brinnon Group's challenge involving the PEA, the Board noted:
Compliance with the [PEA] is a matter outside the Board's jurisdiction.... However, [Brinnon Group] point[s] to a provision of the County Comprehensive Plan which provides that the process for adopting site specific amendments to the Plan shall incorporate "the procedures contained within Chapter 36.70 RCW and the Jefferson County development regulations."... While the Board does not have jurisdiction over Chapter 36.70 RCW, the [PEA], where the County has imposed the requirements of the [PEA] upon itself as part of its process for adopting site specific plan amendments pursuant to RCW 36.70A.140, the Board has jurisdiction to review whether the County has complied with these provisions as a means of satisfying the GMA's public participation program provisions.
AR at 2613 (footnote omitted). The Board rejected Brinnon Group's interpretation of the PEA provisions at issue. The Board subsequently denied Brinnon Group's motion for reconsideration. We detail the Board's conclusions and analysis for each challenged issue in the relevant sections below.
¶ 22 On November 10, Brinnon Group appealed the Board's final decision and order, and the Board's denial of its motion for reconsideration, to Thurston County Superior Court. Brinnon Group subsequently amended its appeal to include its SEPA challenge. On June 30, 2009, the Thurston County Superior Court affirmed the Board's order.

B. COMPLAINT FOR CONSTITUTIONAL AND STATUTORY WRIT BEFORE CLALLAM COUNTY SUPERIOR COURT
¶ 23 Meanwhile, on August 12, 2008, before the Board had issued its final decision and order, Statesman moved to dismiss Brinnon Group's complaint in Clallam County Superior Court. Statesman argued that Brinnon Group's complaint was not properly before the court because Brinnon Group's petition before the Board offered it an adequate remedy at law.
¶ 24 On September 22, after the Board had issued its final decision and order, Brinnon Group moved to stay the Clallam County proceedings until judicial review of the Board's final decision and order had been completed. Brinnon Group also responded to Statesman's motion to dismiss, arguing that it did not have any other adequate remedy at law because "[it] seeks to void challenged Ordinance No. 01-0128-08 from the beginning (void ab initio)." CCP at 115. Brinnon Group asserted that "[n]o other legal process is available to provide the relief of voiding the Ordinance from the beginning." CCP at 115.
¶ 25 On March 9, 2009, while Brinnon Group's appeal to Thurston County Superior Court was still pending, the Clallam County Superior Court denied Brinnon Group's motion to stay the proceedings and dismissed its complaint with prejudice. In a memorandum opinion, the trial court stated:
The critical inquiry in the present case is whether appeal of the [Board's] decision to the Thurston County Superior Court provides [Brinnon Group] with an "adequate remedy[."] While the requested reliefs may not be identical, i.e. invalidity versus void, the substantive relief available to [Brinnon Group] on appeal of the [Board's] decision is essentially the same as that available through the writ process.
....
Therefore, it is the Court's finding that [Brinnon Group has] an adequate remedy through appeal of the [Board's] Final Order and Decision.
CCP at 15, 17.
¶ 26 In this consolidated appeal, Brinnon Group appeals (1) Thurston County Superior Court's order affirming the Board's final decision and order and the Board's order denying its motion for reconsideration, and (2) Clallam County Superior Court's dismissal of its complaint with prejudice.[4]

*798 ANALYSIS

I. JUDICIAL REVIEW, DEFERENCE, AND BURDEN OF PROOF IN GMA CASES
¶ 27 The GMA provides counties with broad discretion to develop comprehensive plans. King Cnty. v. Cent. Puget Sound Growth Mgmt. Hearings Bd., 142 Wash.2d 543, 561, 14 P.3d 133 (2000). A county's discretion, however, "is bounded ... by the goals and requirements of the GMA." King Cnty., 142 Wash.2d at 561, 14 P.3d 133. The GMA's goals include limiting urban growth to urban areas, reducing sprawl, encouraging economic development, retaining open space, enhancing recreational opportunities, conserving habitat and protecting the environment, developing recreational facilities, and encouraging citizen involvement in the planning process. RCW 36.70A.020(1), (2), (5), (9), (10), (11).
¶ 28 The Board adjudicates GMA compliance and may invalidate noncompliant comprehensive plans and development regulations. Lewis Cnty. v. W. Wash. Growth Mgmt. Hearings Bd., 157 Wash.2d 488, 497, 139 P.3d 1096 (2006) (citing RCW 36.70A.280,.302). The Board may also find that a county is not in compliance with the GMA's requirements and remand to enable the county to comply with the GMA's requirements. RCW 36.70A.300(3)(b).
¶ 29 The Board presumes that a county's comprehensive plan is valid upon adoption. RCW 36.70A.320(1). Consequently, the Board must find that a county complied with the GMA unless the party challenging the plan demonstrates that the county's action was "clearly erroneous in view of the entire record before the board and in light of the [GMA's] goals and requirements." Lewis Cnty., 157 Wash.2d at 497, 139 P.3d 1096 (quoting RCW 36.70A.320(3)); see also RCW 36.70A.320(2) (stating that a challenger has burden to demonstrate that a county's action is not GMA-compliant). A county's action is "clearly erroneous" if the Board has a firm and definite conviction that the county made a mistake. Thurston Cnty. v. W. Wash. Growth Mgmt. Hearings Bd., 164 Wash.2d 329, 340-41, 190 P.3d 38 (2008).
¶ 30 The Administrative Procedure Act (APA), chapter 34.05 RCW, governs judicial review of a growth board's actions. Thurston Cnty., 164 Wash.2d at 341, 190 P.3d 38; see also RCW 36.70A.300(5). Under the APA, "[t]he party appealing a board's decision has the burden of demonstrating the invalidity of the board's actions." Thurston Cnty., 164 Wash.2d at 341, 190 P.3d 38; see also RCW 34.05.570(1)(a). In reviewing the Board's actions, "we sit in the same position as the trial court and apply the APA standards directly to the administrative record." Suquamish Tribe v. Cent. Puget Sound Growth Mgmt. Hearings Bd., 156 Wash.App. 743, 760, 235 P.3d 812 (2010) (quoting Superior Asphalt & Concrete Co. v. Dep't of Labor & Indus., 112 Wash.App. 291, 296, 49 P.3d 135 (2002)), review denied, No. 85085-2, ___ Wash.2d ___, ___ P.3d ___ (Wash. Jan. 4, 2011). Thus, like the Board, we defer to the county's planning action unless the action is "clearly erroneous." See Quadrant Corp. v. Cent. Puget Sound Growth Mgmt. Hearings Bd., 154 Wash.2d 224, 238, 110 P.3d 1132 (2005); RCW 36.70A.320(3); See also RCW 36.70A.3201.
¶ 31 Under the APA, we grant relief from the Board's order after an adjudicative proceeding if we determine, in relevant part, that:
(b) The order is outside the statutory authority or jurisdiction of the agency conferred by any provision of law;
....
(d) The agency has erroneously interpreted or applied the law; [or]
(e) The order is not supported by evidence that is substantial when viewed in light of *799 the whole record before the court, which includes the agency record for judicial review, supplemented by any additional evidence received by the court under this chapter.
RCW 34.05.570(3).
¶ 32 We review the Board's "legal conclusions de novo, giving substantial weight to its interpretation of the statutes it administers" and the Board's "findings of facts for substantial evidence." Manke Lumber Co., Inc. v. Cent. Puget Sound Growth Mgmt. Hearings Bd., 113 Wash.App. 615, 622, 53 P.3d 1011 (2002). Substantial evidence is a sufficient quantity of evidence to persuade a fair-minded person of the correctness of the Board's order. Thurston Cnty. v. Cooper Point Ass'n, 148 Wash.2d 1, 8, 57 P.3d 1156 (2002).

II. JEFFERSON COUNTY'S COMPLIANCE WITH ITS PUBLIC PARTICIPATION PROGRAM
¶ 33 Brinnon Group first argues that the Board erred when it determined that the County complied with the public participation requirements of the GMA and the county code. See RCW 36.70A.140; JCC 18.45.010(2). As part of its GMA claim, Brinnon Group argues that the County violated two PEA provisions. See RCW 36.70.400,.430. These arguments fail.
¶ 34 A county planning under the GMA must establish a "public participation program identifying procedures providing for early and continuous public participation in the development and amendment of comprehensive land use plans." RCW 36.70A.140; accord RCW 36.70A.070 ("A comprehensive plan shall be ... amended with public participation as provided in RCW 36.70A.140.") A county's procedures must provide for broad dissemination of proposals, opportunity for written comments, public meetings after effective notice, open discussion, communication programs, information services, and consideration of and response to public comments. RCW 36.70A.140; accord JCC 18.45.010(2). A county's inexact compliance with its established public participation program and procedures, however, does not invalidate a comprehensive plan "if the spirit of the program and procedures is observed."[5] RCW 36.70A.140.
¶ 35 In a nutshell, Brinnon Group argues that the ordinance included significant "changes" from the Commission's recommendation and, therefore, the public should have been given the opportunity to comment on these "changes." Importantly, however, the GMA does not always require additional public comment when a county's legislative body elects to consider a comprehensive plan amendment after the time for comment has passed:
(2)(a) Except as otherwise provided in (b) of this subsection, if the legislative body for a county or city chooses to consider a change to an amendment to a comprehensive plan or development regulation, and the change is proposed after the opportunity for review and comment has passed under the county's or city's procedures, an opportunity for review and comment on the proposed change shall be provided before the local legislative body votes on the proposed change.
(b) An additional opportunity for public review and comment is not required under (a) of this subsection if:

(i) An environmental impact statement has been prepared under chapter 43.21C RCW for the pending resolution or ordinance and the proposed change is within the range of alternatives considered in the environmental impact statement;

RCW 36.70A.035 (emphasis added).
¶ 36 As we discuss in detail below, we agree with Statesman that the substance of many of the BOCC's minor alterations to the Commission's recommendation appeared in the draft EIS. Thus, under RCW 36.70A.035(2)(b)(i), we agree that no further opportunity for public comment was required for these alterations. We also conclude that Brinnon Group's remaining claims that the *800 County violated its public participation program lack merit.

A. COMPREHENSIVE PLAN TEXT AMENDMENT
¶ 37 Brinnon Group contends that the BOCC violated public participation requirements when it adopted the text amendment to the comprehensive plan. Brinnon Group relies primarily on two PEA provisions, RCW 36.70.400 and RCW 36.70.430, to argue that the BOCC cannot adopt a text amendment without first providing the exact language of the text amendment to the Commission, which must then elicit comment on the language at a public hearing.

1. Standard of Review
¶ 38 In addition to the general GMA standard of review, we also review questions of statutory interpretation de novo. Woods v. Kittitas Cnty., 162 Wash.2d 597, 607, 174 P.3d 25 (2007). Our primary goal is to determine and give effect to the legislature's intent. Woods, 162 Wash.2d at 607, 174 P.3d 25. "[I]f the statute's meaning is plain on its face, then the court must give effect to that plain meaning as an expression of legislative intent." Woods, 162 Wash.2d at 607, 174 P.3d 25 (quoting Dep't of Ecology v. Campbell & Gwinn, LLC, 146 Wash.2d 1, 9-10, 43 P.3d 4 (2002)).

2. PEA Requirements
¶ 39 The legislature enacted the PEA in 1959 in order "to provide the authority for, and the procedures to be followed in, guiding and regulating the physical development of a county." RCW 36.70.010; LAWS of 1959, ch. 201. The PEA includes procedures to assist counties in planning for development, including procedures to establish planning commissions, boards of adjustment, and comprehensive plans. See RCW 36.70.010, .030, .200,.320-.340; see also Durocher v. King Cnty., 80 Wash.2d 139, 143, 492 P.2d 547 (1972).
¶ 40 The legislature enacted the GMA over 30 years later, and, as we noted above, the GMA likewise addresses issues of urban development, seeking among other things to limit sprawl and conserve open space. See RCW 36.70A.020(1), (9); LAWS OF 1990, 1st Ex. Sess., ch. 17. Our Supreme Court has observed, therefore, that the PEA and the GMA are "two related statutes which should be `... read together to determine legislative purpose to achieve a harmonious total statutory scheme.'" Whatcom Cnty. v. Brisbane, 125 Wash.2d 345, 354, 884 P.2d 1326 (1994) (internal quotation marks omitted) (alteration in original) (quoting Ellensburg v. State, 118 Wash.2d 709, 713, 826 P.2d 1081 (1992)).
¶ 41 Throughout this analysis, we are mindful of our Supreme Court's observation that the GMA and the PEA must be read together rather than in isolation. Thus, although the GMAnot the PEAincludes the provision in RCW 36.70A.035(2)(b)(i) that an additional opportunity for public comment is not required where a county's legislative body proposes a change to a comprehensive plan amendment as long as the public had the opportunity to consider the proposed change in an EIS, we conclude that this provision applies to a county's planning process as a whole even when the county incorporates procedures from the PEA into its planning process. To conclude otherwise would ignore the reality that these two statutes arise from a common purpose. Such an approach would create discord, not harmony.
¶ 42 Turning to the specific PEA provisions at issue, Brinnon Group points out that, under the PEA, a majority of the county's planning commission must approve a comprehensive plan amendment. RCW 36.70.400; see also RCW 36.70.020(4) (defining "[c]ommission"). The commission's approval "shall be by a recorded motion ... and the reasons for [the commission's] action and the motion shall refer expressly to the maps, descriptive, and other matters intended by the commission to constitute the ... amendment." RCW 36.70.400. The commission's approval "shall be recorded on the map and descriptive matter by the signatures of the chair and the secretary of the commission." RCW 36.70.400.
¶ 43 The PEA also establishes that when the BOCC "considers a change in the recommendations of the planning agency to be necessary," the BOCC may "initiate consideration" of a comprehensive plan amendment. *801 RCW 36.70.430. When the BOCC elects to "initiate consideration" of an amendment, the BOCC "shall first refer the proposed... change ... to the planning agency for a report and recommendation." RCW 36.70.430. Before the planning commission issues its report and recommendation, the commission "shall hold at least one public hearing on the proposed ... change." RCW 36.70.430; see also RCW 36.70.440 (discussing the procedures for the BOCC's approval of the Commission's recommendation).

3. Board's Conclusion
¶ 44 The Board rejected Brinnon Group's argument that the PEA prohibited the BOCC from adopting the text amendment without prior referral to the Commission. In the Board's view, RCW 36.70.430 "[did] not require the exact wording of the text amendment to be included in the Planning Commission's recommendation." AR at 2614. Because the text amendment's language "did not differ in substance from the site specific plan amendment described in the [draft EIS] and the [final EIS] and the recommendation of the Planning Commission," the Board determined that interested citizens had the opportunity to comment on the substance of the proposal embodied in the text amendment. AR at 2614. Accordingly, the BOCC did not violate public participation requirements by adopting the text amendment.

4. Text Amendment Analysis
¶ 45 A plain reading of the PEA supports the Board's interpretation. RCW 36.70.400 does not require the Commission to recommend any specific amendatory language to the BOCC. Rather, the statute requires that the Commission refer to "descriptive[] and other matters intended by the commission to constitute the ... amendment." RCW 36.70.400. In other words, the Commission's job is to adequately describe the amendment's effects, not to draft its specific language. The Commission complied with RCW 36.70.400 because its recommendation to the BOCC adequately described the MPR project as follows: "This proposed MPR rezone of 256 acres on Black Point in Brinnon would create 890 units of permanent and transient housing, an 18 hole golf course, and commercial space along the marina and at the golf course." AR at 1550.
¶ 46 Brinnon Group characterizes the BOCC's adopted text amendment as a "change[] to the [Commission's] recommended MPR amendment." Appellant's Br. at 39. Accordingly, in its view, RCW 36.70.430 prohibited the BOCC from adopting the text amendment without first referring this "change" to the Commission for a public hearing and the Commission's subsequent report and recommendation.
¶ 47 But whether the text amendment contains changes that require referral to the Commission under the language of RCW 36.70.430 does not entirely depend on the precise words that the amendment uses. The language of RCW 36.70.430 suggests that the legislature intended to require referral to the Commission only when the BOCC's changes or additions to the comprehensive plan prevented the public from a full opportunity to comment on the County's proposed action. Moreover, as we noted above, by adopting RCW 36.70A.035(2)(b)(i), the legislature signaled its intent to provide county legislative authorities like the BOCC with greater flexibility in adopting proposed changes to their comprehensive plans. As long as these proposed changes appeared in the draft EIS, which the public may review and comment on, no additional opportunity for public comment is required. RCW 36.70A.035(2)(b)(i). Thus, in addressing Brinnon Group's claim, we must look not only at the Commission's recommendation and the BOCC's adopted text amendment, but also at the information that the County made available for public comment in the draft EIS.
¶ 48 A fair comparison of the Commission's recommendation and the BOCC's text amendment illustrates that the BOCC's text amendment added only a few specific details to the Commission's general project description. Significantly, every single one of these details, except a pronouncement that the County designated the MPR in 2008, was made available for public comment in the *802 draft EIS.[6] Thus, the public had ample opportunity to comment on the specific details that the BOCC ultimately included in the text amendment. We disagree, therefore, that the County violated public participation requirements when it adopted the text amendment.

B. BOCC's MAP AMENDMENT
¶ 49 Brinnon Group also contends that the BOCC violated public participation requirements when it added to the comprehensive plan an MPR boundary map that made "substantial changes" to the Commission's recommended map. Appellant's Br. at 42. This argument fails.
¶ 50 Brinnon Group observes that the BOCC's adopted map differs from the Commission's map in four ways: (1) the BOCC's map includes 15.2 acres of leased DNR tidelands, unlike the Commission's map; (2) the BOCC's map does not include four small parcels,[7] each less than an acre in size, that are included in the Commission's map; (3) the BOCC's map does not include marina, open space, resort district, and tourist commercial designations, as the Commission's map does; and (4) the BOCC's map does not refer to the seven conditions, like the Commission's map does.
¶ 51 The Board did not specifically address this issue, but it did enter a finding, which Brinnon Group challenges on appeal, that the BOCC did not alter the Commission's recommendation "except to add additional conditions." AR at 2643.
¶ 52 We conclude that the BOCC's minor adjustments to the Commission's map complied with the County's public participation program. First, the public had the opportunity to comment on the inclusion of the DNR tidelands, which appeared in the draft EIS. Second, Statesman's application did not include the four small parcels that appeared in the Commission's map; thus, the BOCC's exclusion of these parcels was a corrective measure. Third, although the BOCC's map does not include the Commission's land use designations, the County may add these designations at a later phase. Finally, the BOCC incorporated identical or slightly altered versions of the Commission's seven conditions into the ordinance at finding 63.

C. INCLUSION OF CONDITIONS
¶ 53 Brinnon Group argues that the BOCC made "substantial changes" to the Commission's recommendation by adopting 30 conditions instead of the 7 conditions that the Commission recommended. Appellant's Br. at 10 n.49. Brinnon Group maintains that the public should have had an opportunity to comment on the BOCC's additional conditions. This argument lacks merit.
¶ 54 The Board concluded that the BOCC's additional conditions did not violate the GMA's or the county code's public participation requirements. See RCW 36.70A.140; *803 JCC 18.45.010(2). The Board noted that the county code only requires the BOCC to hold an additional public meeting after its regularly scheduled public hearing if the BOCC determines that a change to the Commission's amendment recommendation is necessary. See JCC 18.45.080(2)(b). The Board observed that the comprehensive plan amendment was "the first step of a five step process" and concluded that the conditions did not alter the Commission's recommendation except to respond to public input about "how the project should be conditioned during subsequent phases of approval." AR at 2616-17.
¶ 55 The BOCC's adoption of additional conditions to guide the MPR development was not clearly erroneous. As the Board noted, these conditions guide future development. Many conditions are directly related to fostering GMA goals like encouraging regional economic development, involving stakeholders, conserving habitat, and protecting the environment. See RCW 36.70A.020. Others are SEPA-related, and, under SEPA, the County has specific authority to impose conditions on a proposed development in order to "mitigate specific adverse environmental impacts." RCW 43.21C.060. SEPA does not require the County to remand these conditions for public comment. See RCW 43.21C.060.

D. COMMISSION'S FAILURE TO SIGN MAP AMENDMENT
¶ 56 Brinnon Group next argues that the Commission violated the PEAspecifically, RCW 36.70.400because the Commission's chair and secretary failed to sign its recommended map until January 8, over a month after the BOCC's public hearing. As we noted above, the PEA requires that the commission's approval "shall be recorded on the map and descriptive matter by the signatures of the chair and the secretary of the commission." RCW 36.70.400. Brinnon Group characterizes this as a "fundamental error" that prevented the BOCC from "understand[ing] the exact material that the [Commission] recommend[ed] for inclusion in the Comprehensive Plan." Appellant's Br. at 7 n.41. We disagree.
¶ 57 The Board rejected this argument. The Board agreed that the Commission's failure to include a signed map did not "fulfill the exact requirement of RCW 36.70.400," but the Board concluded that "this failure is not one that `renders' this comprehensive plan amendment `invalid' as the County fully described and referred to the [final EIS] map of the proposal that was consistent with the one eventually adopted." AR at 2623.
¶ 58 We agree with the Board that the Commission's failure to deliver a timely signed map to the BOCC did not prevent the BOCC from understanding the Commission's recommendation. The Commission's chairman signed the majority recommendation, which described the size, location, and nature of the MPR project. A County staff report delivered to the BOCC stated that the Commission recommended approval of the MPR proposal that appeared in the final EIS. The final EIS describes the project in great detail. Thus, the record does not support Brinnon Group's argument that the BOCC did not understand the Commission's recommendation.

E. EFFECTIVE NOTICE
¶ 59 In a related argument, Brinnon Group argues that the County did not provide the public with "effective notice" of the Commission's map because the Commission's map was not "signed and available" to the public until January 8, after the BOCC stopped accepting public comments. Appellant's Br. at 9 n.44. Brinnon Group suggests that this did not allow the public an adequate opportunity to prepare comments for the BOCC. Again, we disagree.
¶ 60 The GMA's public participation requirements include "notice procedures that are reasonably calculated to provide notice to... affected and interested individuals ... of proposed amendments to comprehensive plans." RCW 36.70A.035(1). The county code also mandates "public meetings after effective notice." JCC 18.45.010(2).
¶ 61 In rejecting Brinnon Group's argument, the Board observed that the county code does not establish a time frame for when the Commission's recommendation *804 must be publicly available. The Board also noted that the County's November 21 published notice informed the public that it could contact the Community Development Department for "further information." AR at 2620. Although the Board described this notice as "less than ideal," it concluded that "interested persons could obtain information about the [Commission's] recommendation after November 21, 2007." AR at 2620. Finally, the Board determined that the Commission's signed map was consistent with the draft EIS maps, which the public saw and commented on.
¶ 62 We agree that the public had effective notice of the MPR proposal at the time of the BOCC's public hearing. Brinnon Group's argument rests on its challenge to the Board's conclusion that the Commission's recommended map was inconsistent with the draft EIS maps that the County provided to the public for comment. Although Brinnon Group exhaustively details the minor differences between these maps, these differences do not support Brinnon Group's contention that the public lacked effective notice of the overall MPR proposal. As we detailed above, the BOCC's adopted boundary map is consistent with the maps that the public viewed in the draft EIS. Thus, the public had effective notice of the proposal that the BOCC adopted. Moreover, even assuming that the ordinance "changed" the proposed amendment, the County was not required to provide an additional comment period under RCW 36.70A.035(2)(b)(i) since the information in the draft EIS clearly reflected the BOCC's changes.

III. INTERNAL CONSISTENCY IN THE COMPREHENSIVE PLAN
¶ 63 Brinnon Group next argues that the BOCC created an internal inconsistency in the County's comprehensive plan because section one of the ordinance amended the existing Comprehensive Plan Land Use Designations Map to reflect an underlying designation of "MPR" on the affected properties without contemporaneously amending the Brinnon Comprehensive Plan Land Use Designations Map in the subarea plan. We disagree.
¶ 64 Under the GMA, a comprehensive plan must be "an internally consistent document and all elements shall be consistent with the future land use map." RCW 36.70A.070 (emphasis added). This requirement means that differing parts of the comprehensive plan "must fit together so that no one feature precludes the achievement of any other." WAC 365-196-500.[8] A comprehensive plan may include a subarea plan that is "consistent with the comprehensive plan." RCW 36.70A.080(2).

A. BOARD'S CONCLUSION
¶ 65 The Board rejected Brinnon Group's argument. The Board, noting that the County "intends to employ a phased process" to develop the MPR, stated that the County would modify the Brinnon Comprehensive Plan Land Use Designations Map during the second phase of the development process, which includes zoning changes. The subsequent modification would make the two maps consistent.

B. INTERNAL CONSISTENCY ANALYSIS
¶ 66 We agree with the Board that there is no inconsistency between the Brinnon Comprehensive Plan Land Use Designations Map and the Comprehensive Plan Land Use Designations Map. As the Board recognized, the County can amend the Brinnon Comprehensive Plan Land Use Designations Map during the second phase. More importantly, however, the Brinnon subarea plan states, "[t]he land use maps provided are for initial discussion purposes only and do not constitute land use designation proposals." AR at 1529. Because the land use designations on the Brinnon Comprehensive Plan Land Use Designations Map are only conceptual, they do not "preclude[] the achievement" of the MPR land use designation on the Comprehensive Plan Land Use Designations Map. See WAC 365-196-500.

*805 IV. BUILDING INTENSITIES
¶ 67 Brinnon Group argues that the County violated RCW 36.70A.070(1) by failing to include the MPR's non-residential building intensities in the comprehensive plan text amendment. RCW 36.70A.070(1) states:
Each comprehensive plan shall include a plan, scheme, or design for each of the following ...
... [a] land use element designating the proposed general distribution and general location and extent of the uses of land.... The land use element shall include population densities, building intensities, and estimates of future population growth.
We reject Brinnon Group's argument.

A. BOARD'S CONCLUSION
¶ 68 The Board concluded that the County did not violate RCW 36.70A.070(1). The Board stated that the comprehensive plan's "goals and policies" would control the MPR's development. AR at 2633. The Board also cited the County's multi-phase development process and determined that the County would "define[] and limit[]" building intensities during the County's subsequent phase. AR at 2633.

B. BUILDING INTENSITIES ANALYSIS
¶ 69 As an initial matter, we note that the Comprehensive Plan Land Use Designations Map does, in fact, include land use designations and rural residential building intensities for the Black Point area. Thus, the County is not is violation of RCW 36.70A.070(1)'s plain language that requires a county's comprehensive plan to include "[a] land use element designating the proposed general distribution and general location and extent of the uses of land .... includ[ing] building intensities."
¶ 70 We are not persuaded by Brinnon Group's argument that RCW 36.70A.070(1) also requires the comprehensive plan to specifically limit commercial building intensities. Here, the comprehensive plan amendment limits the MPR's size to 256 acres and lists the MPR's commercial structures. We agree with the Board that the County may define commercial building intensities during a subsequent development phase. We also note that the County's development regulations for the MPR, including those defining commercial building intensities, must be consistent with the comprehensive plan amendment. See RCW 36.70A.040(3)(d), (4)(d). The amendment, therefore, restricts the scope of the MPR's development. Brinnon Group cites no authority to demonstrate that the County must include commercial building intensities as part of its initial comprehensive plan amendment.
¶ 71 Further, the comprehensive plan contains policies called LNPs that limit the MPR's building intensities. LNP 24.5 and LNP 24.6 describe the residential and non-residential facilities allowed within the MPR. Under these policies, the MPR "shall consist of predominantly short-term visitor accommodations," but may include "some other permanent residential uses," like staff housing and vacation properties. AR at 371. LNP 24.9 requires the MPR to contain "sufficient portions of the site in undeveloped open space for buffering and recreational amenities to help preserve the natural and rural character of the area." AR at 372. The building intensities that the County adopts during the subsequent phase must be guided by these policies and the construction limitations that the ordinance adopted.
¶ 72 Essentially, Brinnon Group highlights problems that might result should the County fail, at a future date, to set commercial building intensities that are consistent with its comprehensive plan. These future theoretical problems do not demonstrate a flaw in the current ordinance, only that the development process is ongoing.

V. SEPA
¶ 73 Brinnon Group further argues that the County violated SEPA by (1) issuing an inadequate final EIS that failed to include reasonable alternatives to Statesman's proposal, and (2) failing to cite a specific policy for each of the 30 conditions that the County included in the ordinance. Brinnon Group asks us to vacate the comprehensive plan amendment on these grounds. We agree *806 with the Board that the County complied with SEPA.

A. REASONABLE ALTERNATIVES IN THE EIS
¶ 74 Brinnon Group contends that the County's final EIS is inadequate as a matter of law because the alternatives considered in the final EIS do not attain the proposal's objectives at a lower environmental cost than the proposal. Brinnon Group argues that "[b]ecause both alternatives allow the Statesman Proposal inside the project boundaries and then allow increased development outside the project boundaries, neither alternative can be `at lower environmental cost.'" Appellant's Br. at 49. We disagree.

1. Standard of Review
¶ 75 The Board has jurisdiction over petitions claiming that a county's comprehensive plan actions are not SEPA-compliant. RCW 36.70A.280(1)(a). We review an EIS's "adequacy"i.e., the legal sufficiency of the environmental data in the EISde novo. King Cnty. v. Cent. Puget Sound Growth Mgmt. Hearings Bd., 138 Wash.2d 161, 183, 979 P.2d 374 (1999); Klickitat Cnty. Citizens Against Imported Waste v. Klickitat Cnty., 122 Wash.2d 619, 633, 860 P.2d 390 (1993). We assess the EIS's adequacy under "the rule of reason." Citizens Alliance to Protect Our Wetlands v. City of Auburn, 126 Wash.2d 356, 361, 894 P.2d 1300 (1995). An EIS is adequate under the rule of reason when it presents decision makers with a "reasonably thorough discussion of the significant aspects of the probable environmental consequences." Residents Opposed to Kittitas Turbines v. State Energy Facility Site Evaluation Council, 165 Wash.2d 275, 311, 197 P.3d 1153 (2008) (quoting Klickitat Cnty. Citizens Against Imported Waste, 122 Wash.2d at 633, 860 P.2d 390). We accord substantial weight to an agency's determination of EIS adequacy. See, RCW 43.21C.090;[9]accord King Cnty., 138 Wash.2d at 183, 979 P.2d 374.

2. EIS's Alternatives
¶ 76 SEPA requires an EIS to include a detailed discussion of alternatives to the proposed action. RCW 43.21C.030(c)(iii). The required discussion of alternatives "is of major importance, because it provides a basis for a reasoned decision among alternatives having differing environmental impacts." Weyerhaeuser v. Pierce Cnty., 124 Wash.2d 26, 38, 873 P.2d 498 (1994). EIS alternatives must "include actions that could feasibly attain or approximate a proposal's objectives, but at a lower environmental cost or decreased level of environmental degradation." WAC 197-11-440(5)(b).
¶ 77 At the outset, we note that the potential for alternatives with less environmental impact was somewhat limited in this case by the intensity of the proposed MPR development itself: 890 units of permanent and transient housing, an 18-hole golf course, and commercial space along the marina. Thus, any "reasonable alternative" had to allow this intense development but attempt to do so at a lower environmental cost.
¶ 78 The EIS proposed three alternatives. The first alternative, the no action alternative, did not allow for resort development at all. The County does not challenge the Board's conclusion that this alternative did not comply with WAC 197-11-440(5)(b) because it did not feasibly attain or approximate the proposal's objective.
¶ 79 We conclude that the final EIS contains evidence that the other two alternatives, the Brinnon Subarea Plan and hybrid alternatives, could attain the proposal's objectives at a lower environmental cost despite occupying a larger footprint (310 acres) than Statesman's proposed MPR (256 acres). For example, the Brinnon Subarea Plan alternative would (1) make the resort more self-sustaining, which would reduce traffic trips; (2) add a sewer system to the marina, which would eliminate a septic system close to *807 Pleasant Harbor; and (3) permit the drilling of wells further inland, thus reducing the possibility of salt water contamination. Although the final EIS contemplates greater environmental impacts than Statesman's proposal in some respectsfor example, increased impervious surfaces and increased development intensity west of Highway 101our Supreme Court has approved EIS alternatives that "present[ ] greater impacts in some areas, and fewer impacts in others." King Cnty., 138 Wash.2d at 185, 979 P.2d 374.[10]
¶ 80 Additionally, we note that the final EIS described in detail how the Brinnon Subarea Plan and hybrid alternatives would impact shellfish, water, shorelines, fish and wildlife, and critical areas, and described mitigation measures for each alternative. Finally, as the Board noted, Brinnon Group offered no evidence that the County failed to consider an alternative that achieved the proposal's objectives at a lower environmental cost. Because the final EIS presented the BOCC with sufficient information for a reasoned decision among alternatives having differing environmental impacts, we conclude that the County complied with its SEPA obligations under WAC 197-1-440(5)(b).

B. FAILURE TO CITE SPECIFIC POLICIES IN THE ORDINANCE
¶ 81 Brinnon Group relies on WAC 197-11-660(1) to argue that the County violated SEPA by failing to cite a specific policy to justify the inclusion of each of the 30 conditions in the ordinance. Brinnon Group does not assign error to the inclusion of any of the conditions. This argument has no merit.

1. Standard of Review
¶ 82 We apply the APA's error of law standard to an agency's interpretation of a statute. Pub. Util. Dist. No. 1 of Pend Oreille Cnty. v. Dep't of Ecology, 146 Wash.2d 778, 790, 51 P.3d 744 (2002) (citing RCW 34.05.570(3)(d)). We interpret agency regulations as if they were statutes. Roller v. Dep't of Labor & Indus., 128 Wash.App. 922, 926, 117 P.3d 385 (2005) (quoting Cobra Roofing Serv., Inc. v. Dep't of Labor & Indus., 122 Wash.App. 402, 409, 97 P.3d 17 (2004)). Under the APA's error of law standard, we determine the meaning of statutes and regulations de novo but give substantial weight to the agency's interpretation of an ambiguous statute or regulation that falls within its area of expertise. See Pub. Util. Dist. No. 1 of Pend Oreille Cnty., 146 Wash.2d at 790, 51 P.3d 744.

2. BOCC's Conditions in the Ordinance
¶ 83 A county may impose conditions on a proposed development in order to "mitigate specific adverse environmental impacts." See RCW 43.21C.060;[11]City of Olympia v. *808 Drebick, 156 Wash.2d 289, 301, 126 P.3d 802 (2006). Any mitigating conditions must be stated in writing and based on policies, plans, rules, or regulations that the county has formally designated as a basis for exercising its substantive authority. RCW 43.21C.060; accord WAC 197-11-660(1)(a), (b). Additionally, "[t]he decision maker shall cite the agency SEPA policy that is the basis of any condition." WAC 197-11-660(1)(b).
¶ 84 Here, the BOCC included 30 conditions of approval in finding 63 of the ordinance. In doing so, the BOCC referenced JCC 18.40.770, a provision that incorporates SEPA's legislative purposes as the basis for the county's exercise of authority.[12] The Board determined that the BOCC's reference to JCC 18.40.770 was a sufficient citation to the SEPA policies under WAC 197-11-660. The Board concluded that WAC 197-11-660 did not require the County to "cite the supporting SEPA policy after each and every condition of approval." AR at 2636. Brinnon Group acknowledges that the County cited to the county code in the ordinance but argues that the Board erred "by allowing citation to such a laundry list." Appellant's Br. at 12 n.55.
¶ 85 The plain language of RCW 43.21C.060 and WAC 197-11-660 supports the Board's interpretation. Nothing in the plain language requires a governmental entity to cite a specific SEPA policy for each mitigating condition that it imposes on a project. Rather, mitigation conditions must be based on "formally designated" policies. RCW 43.21C.060; WAC 197-11-660(1)(a). Here, the County based its written conditions on the general SEPA policies in RCW 43.21C.020, a statutory section that the County adopted by reference in JCC 18.40.770.
¶ 86 Brinnon Group relies on Levine v. Jefferson Cnty., 116 Wash.2d 575, 807 P.2d 363 (1991) to support its position. Levine is distinguishable, however, because it involved a situation where the county did not consider any identifiable policies in attaching mitigative restrictions to a building permit. 116 Wash.2d at 581, 807 P.2d 363. Levine does not require the County to cite a specific SEPA policy for each condition of approval in the ordinance.

VI. MOTION FOR RECONSIDERATION
¶ 87 Brinnon Group assigns error to the Board's denial of its motion for reconsideration. We generally review a denial of a motion for reconsideration for abuse of discretion. Lilly v. Lynch, 88 Wash.App. 306, 321, 945 P.2d 727 (1997). Here, the trial court's denial was proper.
¶ 88 Brinnon Group based its motion on WAC 242-02-832(a) and (c), arguing that the Board made "[e]rrors of procedure or misinterpretation of fact or law" and "[c]lerical mistakes in the final decision and order." Specifically, Brinnon Group argued that the Board erred when it concluded that (1) the Brinnon Subarea Plan and hybrid alternatives did not violate SEPA, (2) the County could modify the Brinnon Comprehensive Plan Land Use Designations map during the zoning phase, and (3) the PEA did not require the Commission to submit the exact wording of the text amendment to the BOCC.
¶ 89 Our decision has addressed each of these arguments on the merits and concluded that the Board did not err in rejecting them. Thus, the Board properly exercised its discretion in denying Brinnon Group's motion for reconsideration. Accordingly, we decline to address Brinnon Group's extensive discussion of whether its motion presented "new argument" or "more precise and thorough" argument. See Appellant's Br. at 57.

*809 VII. CLALLAM COUNTY SUPERIOR COURT'S DISMISSAL OF BRINNON GROUP'S COMPLAINT
¶ 90 Finally, we must determine whether Clallam County Superior Court erred when it dismissed Brinnon Group's complaint for a constitutional writ of certiorari.[13] We affirm the superior court's dismissal.

A. STANDARD OF REVIEW
¶ 91 Superior courts have the power to issue writs of certiorari. Wash. Const. art. IV § 6. We review a superior court's decision to grant or deny a writ of certiorari de novo. See Torrance v. King Cnty., 136 Wash.2d 783, 787, 966 P.2d 891 (1998) (citing Thomsen v. King Cnty., 39 Wash.App. 505, 514-15, 694 P.2d 40 (1985)).
¶ 92 A constitutional writ of certiorari is not a matter of right but, rather, is discretionary with the court. Torrance, 136 Wash.2d at 787, 966 P.2d 891. A superior court properly exercises its discretion to grant a writ of certiorari when "no other adequate remedy at law is available and when the decision below is arbitrary, capricious, or contrary to law." Torrance, 136 Wash.2d at 787-88, 966 P.2d 891. A constitutional writ of certiorari is unavailable, however, if the reviewing court's power to grant relief from an agency order under the APA will provide complete and full relief. See Torrance, 136 Wash.2d at 791, 966 P.2d 891; see also RCW 34.05.574 (describing the relief that a court may provide under the APA).

B. BRINNON GROUP'S CLAIMS BEFORE CLALLAM COUNTY SUPERIOR COURT
¶ 93 Brinnon Group correctly notes that RCW 36.70A.280(1)[14] limits the Board's jurisdiction to certain subject matters. On its face, that subsection does not authorize the Board to hear and determine petitions alleging violations of the PEA. See RCW 36.70A.280(1). Brinnon Group contends, therefore, that because the Board had no statutory authority to consider any of the County's alleged PEA violations that were unrelated to the GMA's public participation requirements, judicial review of the Board's order did not provide it with an adequate remedy to address these alleged PEA violations.[15] We disagree.

1. The PEA's Applicability to the County's Action
¶ 94 As we noted above, the PEA is implicated here because the County's comprehensive plan specifically requires the County to comply with the PEA's procedures when amending its comprehensive plan. In its petition for review before the Board, Brinnon Group alleged that the County's ordinance violated the GMA and SEPA but did not allege that the County violated the PEA. Consequently, Brinnon Group filed a complaint for a constitutional writ in Clallam County Superior Court in order to seek a remedy for the alleged PEA violations. Even though Brinnon Group did not allege PEA violations in its petition for review before the Board, its opening brief to the Board explicitly argued that the County's non-compliance with two PEA provisions specifically, RCW 36.70.400 and RCW 36.70.430violated the "spirit" of the County's public participation program under the GMA.

2. The Board's Decision
¶ 95 As we noted above, the Board's final decision openly acknowledged that the Board *810 lacked jurisdiction under RCW 36.70A.280(1) to review the County's alleged PEA violations. But the Board determined that it had jurisdiction to review the County's alleged PEA violations as part of its overall review of the County's compliance with the GMA's public participation provisions.

3. Jurisdiction Analysis
¶ 96 Brinnon Group acknowledges in its brief that the Board acted properly by considering its contention that "the County violated the GMA statute, RCW 36.70A.140, because of violations of PEA statutes." Appellant's Br. at 28. Despite that Brinnon Group agrees with the Board's decision to address its PEA-related arguments on the merits, it argues that the two provisions of the PEA that the County allegedly violated, RCW 36.70.400 and RCW 36.70.430, are not merely "public participation" provisions incorporated into the GMA; rather, in Brinnon Group's view, the County must also "substantially comply" with these provisions in order "to have authority under the PEA to adopt comprehensive plan amendments." Appellant's Br. at 3 n.22. This strained argument is meritless.
¶ 97 We agree that the Board had jurisdiction to consider Brinnon Group's arguments that the County violated RCW 36.70.400 and RCW 36.70.430 in the context of Brinnon Group's overall challenge to the County's compliance with the GMA's public participation requirements. Again, we emphasize the importance of reading the GMA and the PEA in harmony. The GMA gives the Board jurisdiction to review allegations that the County violated the GMA, including the GMA's public participation requirements. RCW 36.70A.280(1). Brinnon Group itself argued to the Board that the County violated the GMA's public participation requirements by failing to comply with RCW 36.70.400 and RCW 36.70.430.
¶ 98 Because the Board had jurisdiction to consider Brinnon Group's arguments that the County violated RCW 36.70.400 and RCW 36.70.430 as part of its broader GMA review, the Board could folly assess Brinnon Group's claims that the County's comprehensive plan amendment did not comply with these PEA provisions. Likewise, Thurston County Superior Court's review of the Board's order under the relevant APA standards provided Brinnon Group with an adequate remedy. Consequently, Brinnon Group had another adequate remedy at law and the Clallam County Superior Court did not err by dismissing Brinnon Group's complaint for a constitutional writ.[16]
¶ 99 We deny Brinnon Group's request for attorney fees. We affirm the judgments of the Clallam and Thurston County superior courts.
We concur: ARMSTRONG and VAN DEREN, JJ.
NOTES
[1] We refer to both appellants as "Brinnon Group."
[2] The legislature has repeatedly amended the GMA, the PEA, and SEPA since Brinnon Group filed its petition for review and complaint in early 2008. See, e.g., LAWS OF 2010, ch. 211; LAWS OF 2010, ch. 8; Laws of 2009, ch. 549. Because these amendments do not impact the present analysis, we cite to the current versions of these statutes.
[3] Specifically, condition 1 is found in finding 63a, condition 2 is in finding 63c, condition 3 is in findings 63e and 63f, condition 4 is in finding 63h, condition 5 is in finding 63j, condition 6 is in finding 63s, and condition 7 is part of findings 63n-r.
[4] Brinnon Group assigns 45 errors to the proceedings below and lists 12 "Major Issues Before This Court." Appellant's Br. at 15. One alleged error challenges 13 of the Board's findings of fact; another challenges 10 of the Board's conclusions of law. The 45 alleged errors, including those challenging the Board's findings and conclusions, run the gamut from minor typographical errors to alleged legal errors which, if sustained, would support Brinnon Group's argument that the Board erred by failing to enter a finding of noncompliance or a determination of invalidity. Rather than providing a "separate concise statement" of each alleged error, as RAP 10.3(a)(4) counsels, Brinnon Group discusses many of its assigned errors in lengthy footnotes that internally cross-reference other sections and footnotes. We address Brinnon Group's "major issues," leaving aside discussion of alleged errors which, if sustained, would not affect the case's outcome.
[5] Brinnon Group, citing language from a service of process case, asks us to interpret compliance with "the spirit of the program and procedures" as meaning "substantial compliance." Appellant's Br. at 38 (citing Weiss v. Glemp, 127 Wash.2d 726, 903 P.2d 455 (1995)). We decline to do so.
[6] The following specific details appear in the BOCC's text amendment but not in the Commission's recommendation:

 The County designated the MPR in 2008;
 The MPR includes the Pleasant Harbor area;
 "Permanent and transient housing" will include "townhouses and villas" and staff housing;
 Specified facilities, including the golf course and resort, will be located in "[t]he Black Point area of the new resort;"
 "Commercial space" will include a restaurant and resort center; and
 A community center will be built.
Compare AR at 1550 with AR at 1638. But the draft EIS contains information that is nearly identical to the information in the BOCC's text amendment:
The Pleasant Harbor Marina and Gold Resort Master Plan proposal involves two components:
 The Golf Course and resort located on the Black Point portion of the property south of Black Point Road.
 The marina and Maritime Village adjacent to the current Pleasant Harbor Marina and north of Black Point Road.
....
The MPR for the Black Point [L]ands ... includes... [a] championship 18-hole golf course ... [a] 60,000 square foot resort center... [a] [r]estaurant and lounge with outdoor lanai ... [a] conference center and reception... 462-two-story garden townhomes . . . 97-one level villas ... 52-unit staff housing ... [a] 200-seat community center.
AR at 1715, 1717, 1728.
[7] The parcels in question are the Stevens (0.6 acres), Dowd (0.4 acres), Voetberg (0.8 acres), and DNR (0.2 acres) parcels at the MPR's northern tip.
[8] When Jefferson County enacted the ordinance, this language appeared in a different chapter of the Washington Administrative Code. See former WAC 365-195-070(7) (1992), repealed by Wash. State Register. XX-XX-XXX (Feb. 19, 2010).
[9] Washington courts have not explored the interplay between the rule of reason and RCW 43.21C.090's principle of agency deference. See RICHARD L. SETTLE, THE WASHINGTON STATE ENVIRONMENTAL POLICY ACT: A LEGAL AND POLICY ANALYSIS § 14.01[1][b], at 14-22 (2009) (observing that Washington courts have never explained "how much, if at all, [RCW 43.21C.090] reduces the level of judicial scrutiny.").
[10] In King County, the court considered the EIS for a proposed 2,250 unit housing development on a 1,000 acre parcel. 138 Wash.2d at 172-73, 979 P.2d 374. The court concluded that a less dense one-unit-per-acre alternative was reasonable under WAC 197-11-440(5)(b). 138 Wash.2d at 185, 979 P.2d 374. Although the alternative "presented greater impacts in some areas," it would develop 2,000 fewer residences, require 121 fewer acres of impervious surface, produce 45 percent less carbon monoxide, lead to less water consumption, and have a lower potential to alter groundwater flow than the proposed development. 138 Wash.2d at 185, 979 P.2d 374.

Brinnon Group suggests that King County articulates a rule that, for an alternative to be "reasonable" under SEPA, it must have "intermediary impacts" between the proposal and the no action alternative. Appellant's Reply Br. at 29 (quoting King Cnty., 138 Wash.2d at 184, 979 P.2d 374). While the King County court indeed described the one-unit-per-acre alternative as "present[ing] intermediary impacts" between the proposal and the no action alternative, the court approved the alternative because it had "fewer impacts" in some areas. 138 Wash.2d at 184-85, 979 P.2d 374.
[11] RCW 43.21C.060 states in relevant part:

Any governmental action may be conditioned or denied pursuant to this chapter: PROVIDED, That such conditions or denials shall be based upon policies identified by the appropriate governmental authority and incorporated into regulations, plans, or codes which are formally designated by the agency (or appropriate legislative body, in the case of local government) as possible bases for the exercise of authority pursuant to this chapter. Such designation shall occur at the time specified by RCW 43.21C.120. Such action may be conditioned only to mitigate specific adverse environmental impacts which are identified in the environmental documents prepared under this chapter. These conditions shall be stated in writing by the decisionmaker.
[12] Specifically, finding 63 stated that the BOCC entered the conditions "pursuant to the authority that is granted the County legislative authority under SEPA by RCW 43.21C.060, WAC 197-11-660 and Jefferson County Code 18.40.770." AR at 1632. JCC 18.40.770(3)(b) appears in the article of the county code entitled "[SEPA] Implementation" and states in relevant part: "The county designates and adopts by reference ... as the basis for exercise of county authority pursuant to this article ... [t]he policies enumerated in RCW 43.21C.020."
[13] In this appeal, Brinnon Group appears to acknowledge that it is not entitled to a statutory writ. See Appellant's Br. at 32 (noting that a statutory writ is not available for legislative decisions like comprehensive plan amendments).
[14] The statute states, in relevant part:

The growth management hearings board shall hear and determine only those petitions alleging... [t]hat, except as provided otherwise by this subsection; a state agency, county, or city planning under this chapter is not in compliance with the requirements of this chapter ... or chapter 43.21C RCW as it relates to plans, development regulations, or amendments, adopted under RCW 36.70A.040 or chapter 90.58 RCW.
RCW 36.70A.280(1)(a) (emphasis added).
[15] Essentially, this is an argument under the APA that the portion of the Board's order related to PEA compliance is "outside the statutory authority or jurisdiction of the agency conferred by any provision of law." RCW 34.05.570(3)(b).
[16] In this appeal, the parties do not address, as they did below, whether the Land Use Petition Act also offered Brinnon Group an adequate alternative remedy.